**UNITED STATES of America,
Plaintiff,**

v.

**Ray Lee D'ARMOND, Brian Keith
Lindberg, Defendants.**

Nos. 98–40076–01–SAC, 98–4007602–SAC.

United States District Court,
D. Kansas.

Oct. 13, 1999.

Order Denying Reconsideration
Nov. 18, 1999.

Anthony W. Mattivi, Office of United States Attorney, Topeka, KS, for U.S.

Randy L. Baird, Topeka, KS, Chris N. Cowger, Topeka, KS, Mark L. Bennett, Jr., Mark L. Bennett, Jr. & Associates, Topeka, KS, Stephen W. Kessler, Topeka, KS, Eric Kjorlie, Topeka, KS, J. Richard Lake, Holton, KS, William K. Rork, Rork Law Office, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

On November 19, 1998, the grand jury returned a superseding indictment [1] charging Ray Lee D'Armond, Jr. and Brian Keith Lindberg with conspiring to manufacture in excess of 10 grams of methamphetamine (in violation of 21 U.S.C. § 841(a)(1)), attempting to manufacture methamphetamine (in violation of 21 U.S.C. § 841(a)(1), and creating a substantial risk of harm to human life by attempting to manufacture methamphetamine (in violation of 21 U.S.C. § 858). D'Armond is also charged with one count of being a felon in possession of a firearm (in violation of 18 U.S.C. § 922(g)(1)), one count of using and carrying a firearm during and in relation to a drug trafficking crime (in violation of 18 U.S.C. § 924(c)) and two counts of possessing listed chemicals (iodine and ephedrine) with the intent to manufacture methamphetamine (in violation of 21 U.S.C. § 841(d)(1)).

On August 13, 1999, this court entered a memorandum and order ruling on several pending motions in this case. *See United States v. D'Armond,* 65 F.Supp.2d 1189 (D.Kan.1999).

On October 5, 1999, the court conducted a hearing to consider the following motions which remained undecided:

**D'Armond's Motions (now represented by William Rork):**

---

1. The original indictment only named D'Armond as a defendant. The superseding indictment added Lindberg as a defendant. The superseding indictment also adds two counts concerning the alleged possession of iodine and ephedrine with the intent to manufacture methamphetamine.

1. Motion to Suppress (Dk. 16); Brief in Support (Dk. 17); Supplemental Brief in Support (Dk. 29); Supplemental Motion to Suppress Illegally Seized Evidence and Memorandum in Support Thereof (Dk. 129).
2. Motion for Enlargement of Time in Which to File Additional Motions (Dk. 130).

Lindberg's Motion (now represented by Randy Baird):

1. Motion to Suppress Evidence (Dk. 61); Memorandum in Support of Motion to Suppress (Dk. 62).

The government filed a consolidated response to the defendants' first round of motions to suppress (Dk. 72) and a separate response (Dk. 132) to D'Armond's supplemental motion to suppress.

During the October 5, 1999, hearing, the court heard the testimony of witnesses and received into evidence a videotape of the traffic stop of D'Armond and the search warrant application/search warrant for D'Armond's trailer. The court has since watched the videotape of the traffic stop. The tape is of poor quality, as the darkness of night and bright lights of passing autos mix to make it very difficult to discern what is transpiring. Much of the tape is also inaudible. Having considered the evidence presented, the arguments and briefs of counsel, the court is now prepared to rule.

**Motion to Suppress (Dk. 16); Brief in Support (Dk. 17); Supplemental Brief in Support (Dk. 29); Supplemental Motion to Suppress Illegally Seized Evidence and Memorandum in Support Thereof (Dk. 129); Motion to Suppress Evidence (Dk. 61); Memorandum in Support of Motion to Suppress (Dk. 62).**

D'Armond seeks an order suppressing from evidence items seized from his person and truck following a stop for a broken tag light. Although he consented to the search of his truck, D'Armond now contends that his consent was involuntary and the product of an illegal detention. D'Armond contends that the *Terry* pat down

before the search of his truck was also unlawful. D'Armond also seeks to suppress from evidence all items seized during the search of his trailer, arguing that the subsequent search of his trailer stemmed from information illegally obtained during the traffic stop and therefore must be suppressed under the fruit of the poisonous tree doctrine.

Lindberg seeks an order suppressing the fruits of the search of D'Armond's trailer. Lindberg, who claims to have been an overnight guest at the mobile home (and therefore has standing),[2] argues that the officers initial entry into the home was unlawful as they did not have a search warrant at the time they entered. Lindberg also contends that no exigent circumstance existed which would have justified a warrantless entry and placing him under arrest. During the post-arrest search of his person, a small vial of alleged drugs was found.

The government responds, arguing that the initial stop of the vehicle for a broken tag light was lawful, that D'Armond was not unlawfully detained when he consented to the search of his vehicle, and that the search of D'Armond's person was a permissible *Terry* pat down for weapons. Once the vial of methamphetamine was discovered, Officer Thompson had probable cause to arrest D'Armond and search his vehicle incidental to an arrest.

As to the search of D'Armond's mobile home, the government contends that exigent circumstances justified the warrantless entry. Specifically, the government contends that the officers' entry was justified to prevent possible destruction of evidence and to protect the safety of everyone inside or nearby. In the alternative, the government contends that the evidence would have been inevitably discovered during the execution of the search warrant. As to the search of Lindberg's person, the government contends that Lindberg voluntarily consented to the search of his person. In the alternative, the government

2. *See Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

contends that the officers had probable cause to arrest Lindberg for manufacturing methamphetamine and that the search of his person was valid.

### Findings of Fact

Based upon numerous citizen complaints, a "Crime Stoppers" tip, and information from a reliable confidential informant, officers focused their attention on 926 N.W. Western, a trailer home and the residence of Ray Lee D'Armond. On June 16, 1998, Topeka Police Narcotics Detective Thompson was conducting surveillance on D'Armond's residence. As D'Armond drove away from the residence in his 1989 pickup, Detective Thompson noticed that D'Armond's tag light was not working. Detective Thompson contacted Corporal Chapman to stop D'Armond for the defective tag light; driving without a tag light is a violation of a city ordinance.

D'Armond's vehicle was in fact stopped by Corporal Chapman. Upon learning the reason for the stop, D'Armond admitted that the tag light was not working and that he had parts in his truck to replace the light. During the time that D'Armond waited by the rear of his truck, he repeatedly put his hand in his front right pocket. A routine check for outstanding warrants revealed the possibility of one or more warrants for some parking violations, but nothing could be confirmed. After returning D'Armond's papers and informing him that he should try to resolve the issue of whether he still had any outstanding parking violations, Corporal Chapman thanked D'Armond for his cooperation.

As D'Armond turned to leave, Corporal Chapman asked D'Armond if he had any alcohol, guns or drugs in the truck. D'Armond said that he did not. Corporal Chapman asked D'Armond if he would mind if he took a quick search of D'Armond's truck to confirm the truth of D'Armond's statement. Although he initially took umbrage at Corporal Chapman's request, D'Armond consented the search of his truck. Prior to searching the truck, but after obtaining consent to search the truck, Corporal Chapman conducted a *Terry* search for weapons. During the *Terry* search, Officer Chapman felt a small cylindrical object in D'Armond's right front pocket. Officer Chapman asked D'Armond "what was in that pocket." At first D'Armond said he didn't know, but he reached in and pulled out a lighter and a small bottle containing a white powder. Believing the bottle to contain methamphetamine, Corporal Chapman placed D'Armond under arrest for possession of drug paraphernalia. Officer Thompson's subsequent search of the vehicle revealed a gun and several items used in the manufacture of methamphetamine.

Based upon this information, Officer Thompson returned to headquarters to type an affidavit in the hope of obtaining a search warrant to search D'Armond's mobile home. Before obtaining the search warrant, Corporal Chapman told other officers to secure the mobile home. Upon arriving at the mobile home, officers knocked on the door but no one answered. The officers then knocked all around the exterior of the trailer, but still no one responded. Concerned about the safety of the occupant, and concerned that evidence was being destroyed, officers forced the door open, again announcing their presence. Inside the trailer, officers discovered the odor of methamphetamine. Officers discovered a white male—the co-defendant Lindberg—who appeared delirious, drugged or extremely sleepy. While inside the trailer, Officers observed a methamphetamine processing lab. The inside of the trailer reeked of the odor of methamphetamine. Lindberg was placed in handcuffs and assisted outside.

Outside the trailer, Lindberg consented to a search of his person. During the search, Officer Roberts found, *inter alia,* a pocket knife and a small bottle of what appeared to be amphetamine. Officers waited for DEA agents and the HAZ MAT team to arrive at the mobile home and for the issuance of the search warrant.

Following the officers' warrantless entry into the trailer, the application for the

search warrant was completed. The search warrant was issued approximately a half-hour after officers exited the mobile home. The six-page application for the search warrant included the following two sentences describing the officers' observations of the interior of D'Armond's trailer during their warrantless entry: "Once inside [D'Armond's trailer, the officers] encountered a Brian K. Linburg (sic) that was unconscious in a room that had a filtration system for the final stage of methamphetamine production. The system was filtrating methamphetamine." Based upon this information and all of the other information obtained before and during the traffic stop of D'Armond, a search warrant was issued. During the execution of the search warrant, items used to manufacture methamphetamine were seized.

### Governing Law

 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). There are three general types of citizen-police encounters: (1) consensual encounters that are not Fourth Amendment seizures as they involve a person's voluntary cooperation with an officer's non-coercive questioning; (2) investigative detentions which are Fourth Amendment seizures justified only if there is reasonable suspicion that the person has committed or is committing a crime; and (3) arrests which

are Fourth Amendment seizures characterized by highly intrusive or lengthy detention and justified only if there is probable cause to believe that the person has committed or is committing a crime. *United States v. Seslar*, 996 F.2d 1058, 1060 (10th Cir.1993). Because the temporary stop of an automobile is considered a seizure of "persons," it must not be "unreasonable." *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, 95 (1996) The stop is "reasonable" if the law enforcement officer has "probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d at 95 (citations omitted).[3]

 The detention associated with the traffic stop also "must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir.1997) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such a detention "usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.' " *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Hunnicutt*, 135 F.3d at 1349; *see United*

---

**3.** In *United States v. Botero–Ospina*, 71 F.3d 783 (10th Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996), the Tenth Circuit set for these standards for evaluating the validity of a traffic stop:

[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the gener-

al practice of the police department or the particular officer making the stop." *Ferguson*, 8 F.3d at 391. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*Id.* at 787 (footnote omitted). *See Whren*, 517 U.S. at 813, 116 S.Ct. 1769 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

*States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997). "Once the officer has conducted such a check and 'the driver has produced a valid license and proof that he is entitled to operate the car, [the driver] must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Anderson,* 114 F.3d at 1064 (quoting *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)).

There are two circumstances when detention can be lengthened by additional questioning. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *United States v. Hunnicutt,* 135 F.3d at 1349 (citation omitted); *see also United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997). Second, further questioning unrelated to the initial stop is permissible if the initial detention is over and the encounter becomes consensual with the driver voluntarily consenting to additional questions. *United States v. Mendez,* 118 F.3d at 1429; *see also United States v. Hunnicutt,* 135 F.3d at 1349.

### Analysis

*Initial Stop*

In his supplemental pleading, D'Armond concedes that the initial stop of his truck was lawful. During the traffic stop, D'Armond admitted that the tag light was defective. The initial stop of the defendant's truck was not unlawful.

*Consensual Encounter/Consensual Search*

#### Consensual Encounter

*Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991) has reconfirmed the Supreme Court's adherence:

to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the en-counter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

That totality-of-the-circumstances approach means that "[n]o single factor dictates whether a seizure has occurred" (*United States v. Houston,* 21 F.3d 1035, 1037 (10th Cir.1994)). In the context of traffic stops this Circuit has adopted as an indicium of a seizure the officer's taking of necessary documentation (driver's license and vehicle registration) from a driver, and we have also considered as a necessary (but not always sufficient) condition of the termination of that seizure the officer's return of such documentation—both of those rulings being based on the premise that the requisite consent is impossible because no "reasonable person" would feel free to leave without such documentation (*United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993)).

After the point at which the driver has his or her other documentation back, the touchstone of our analysis is simply whether—adapting the language of *Bostick* to the circumstances of a traffic stop—the driver (*United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990)):

has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way.

Where such a belief is present based on the "objective" facts of the situation, a voluntary police-citizen encounter is said to arise (*see, e.g., McKneely,* 6 F.3d at 1451–53; *Werking,* 915 F.2d at 1409). *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994); *see Lee,* 73 F.3d at 1040 (The Tenth Circuit has "consistently held 'that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him.'") (*quoting United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114

S.Ct. 1862, 128 L.Ed.2d 484 (1994)). "A limited number of routine questions about travel plans and relationship to passengers, followed by a question about possession of contraband and a request to search, are not sufficient to render an otherwise consensual encounter coercive." *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996).

 A law enforcement officer is not required to specifically tell the driver that he is free to leave in order for an encounter to be consensual. *United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir. 1997) (*citing Ohio v. Robinette,* 519 U.S. 33, 38, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (rejecting per-se rule that detention pursuant to a traffic stop cannot become consensual until officer has told detainee that he is free to leave) and *United States v. Elliott,* 107 F.3d 810, 814 (10th Cir.1997) (noting that encounter was consensual even though officer did not tell driver she was free to go)).

**Consensual Searches**

 Under the Fourth and Fourteenth Amendments a search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A search authorized by consent is wholly valid and is a well-recognized exception to the prohibition against warrantless searches. 412 U.S. at 219, 93 S.Ct. 2041. Voluntariness is a question of fact to be determined from the totality of all the circumstances. 412 U.S. at 227, 93 S.Ct. 2041. The government has the burden of proving the voluntariness of the consent. 412 U.S. at 222, 93 S.Ct. 2041; *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993) ("The voluntariness of consent must be determined from the totality of the circumstances, and

the government bears the burden of proof on the issue.").[4] The government "must demonstrate with 'clear and positive testimony that consent was "unequivocal and specific" and "freely and intelligently" given.'" *United States v. Dewitt,* 946 F.2d 1497, 1500 (10th Cir.1991) (*quoting United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977)), *cert. denied,* 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). The government must also prove that the consent was given without duress or coercion, express or implied. *Id.*

 The Tenth Circuit has developed a two-step inquiry to determine whether the government has sustained its burden of showing that the consent to search was voluntary. To admit evidence obtained from a search, wherein consent was given, the following must be found:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

*United States v. Butler,* 966 F.2d 559, 562 (10th Cir.1992) (*citing United States v. Price,* 925 F.2d 1268, 1270–71 (10th Cir. 1991)). "When making this determination, the court should not presume that the consent was either voluntary or involuntary." *Soto,* 988 F.2d at 1557.

**Analysis**

 The government has carried its burden of demonstrating that D'Armond's consent to search his truck was voluntary. At the time he consented to the search, D'Armond was free to leave and was not unlawfully detained. Although questioning Corporal Chapman's need to conduct a search of his truck, the evidence makes clear that D'Armond unequivocally and freely consented to the search of his truck,

4. The government's "burden is heavier when consent is given after an illegal stop." *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir.1994). "The government must prove that [the defendant's] consent to search is 'sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree.'" *Id.* (*quoting United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir.1989)).

and that voluntary consent was obtained without duress or coercion, express or implied.

### Search of D'Armond's Person
#### *Terry* Pat Down

■ In *Terry v. Ohio*, the Supreme Court approved a limited search—a pat down for weapons—for the protection of an officer investigating suspicious behavior of persons he reasonably believed to be armed and dangerous. "The Court approved such a search on facts that did not constitute probable cause to believe the suspects guilty of a crime, requiring only that 'the police officer ... be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' a belief that his safety or that of others is in danger." *United States v. Brignoni–Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (citing *Terry*, at 21, 88 S.Ct., at 1880). An officer may not conduct a *Terry* pat down unless supported by a reasonable belief that the person was armed and presently dangerous, a belief which the Supreme Court "has invariably held must form the predicate to a pat down of a person for weapons." *Ybarra v. Illinois*, 444 U.S. 85, 92, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (citing *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612; and *Terry v. Ohio*, 392 U.S., at 21–24, 27, 88 S.Ct., at 1879–1881, 1883).

#### Analysis

■ The circumstances which confronted Corporal Chapman justified a *Terry* pat down for weapons. At the time of the pat down, Corporal Chapman knew that the defendant appeared to be engaged in the unlawful manufacture of methamphetamine. While waiting by the rear of his truck during the traffic stop, D'Armond repeatedly placed his hand inside his right pants pocket. The search was to occur late at night, in the dark, and the officer conducting the search would have to turn his back on the defendant during the search. Corporal Chapman's safety concerns warranted a quick pat down before the search. Of course, because he was otherwise free to go, at that point in time D'Armond could have simply withdrawn his consent to search his truck and proceeded on his way.

■ As he started the pat down, Corporal Chapman asked D'Armond "what do you have in your pocket." D'Armond pulled a lighter and a small bottle containing a white powder. D'Armond initially denied that there was any substance in the bottle. Confronted with the contents of the bottle, D'Armond also indicated that he had simply found the bottle and did not know what it contained. At the point he observed the small vial which appeared to contain methamphetamine, Corporal Chapman had probable cause to arrest D'Armond.

### Search Incident to an Arrest

In [*New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) ], the Supreme Court held that the police may conduct a contemporaneous warrantless search of a vehicle's passenger compartment incident to a lawful arrest. *Belton*, 453 U.S. at 460, 101 S.Ct. 2860 [69 L.Ed.2d 768]. The Court deliberately created a bright line rule because "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Id.* at 458, 101 S.Ct. 2860 (*quoting Dunaway v. New York*, 442 U.S. 200, 213–14, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)); *see United States v. Olguin–Rivera*, 168 F.3d 1203 (10th Cir.1999). A warrantless search incident to arrest is valid so long as: (1) there existed a legitimate basis for the arrest before the search; and (2) the arrest took place shortly after the search.

*United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir.1999).

### Analysis

■ After placing D'Armond under arrest, the officers lawfully searched the passenger compartment and accessible cargo area of the truck incident to D'Armond's arrest. *See United States v. Lacey,* 86 F.3d 956, 971 (10th Cir.) ("We have previously held that where an officer has made a lawful arrest of a suspect in an automobile, the officer may seize items of evidence found within the passenger compartment of the vehicle as part of a search incident to a lawful arrest, even when the suspect is outside of the vehicle and handcuffed."), *cert. denied,* 519 U.S. 944, 117 S.Ct. 331, 136 L.Ed.2d 244 (1996). *Cf. United States v. Olguin–Rivera,* 168 F.3d at 1207, (incident to an arrest, officers may search the entire passenger compartment, including the interior cargo or luggage area, or sport utility vehicles or similarly configured automobiles, whether covered or uncovered).

*Search of D'Armond's Residence (the trailer)*

### Exigent Circumstances

■ "The notion that emergency circumstances may in appropriate cases make a warrantless search constitutional if probable cause exists is a clearly established exception to the warrant requirement." *United States v. Aquino,* 836 F.2d 1268, 1270–71 (10th Cir.1988). "The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson,* 981 F.2d 1560, 1567 (10th Cir.1992). "Although we accept underlying fact findings unless they are clearly erroneous, 'the determination of whether those facts satisfy the legal test of exigency is subject to de novo review.'" *Id.* (*quoting United States v. Stewart,* 867 F.2d 581, 584 (10th Cir.1989)).

The government bears the burden of proving exigency. *United States v. Wicks,* 995 F.2d 964, 970 (10th Cir.1993). In assessing whether the burden was met, we are guided by the realities of the situation presented by the record. We should evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers. *Id.* There is no absolute test for determining whether exigent circumstances are present because such a determination ultimately depends on the unique facts of each controversy. However, we have recognized certain general factors. *Id.*

An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indications of exigency that are not subject to police manipulation or abuse. *United States v. Carr,* 939 F.2d 1442, 1448 (10th Cir.1991).

Finally, we should remember that, "[a]s an exception to the warrant requirement, exigent circumstances must be 'jealously and carefully drawn.'" *Anderson,* 981 F.2d at 1567 (*quoting Aquino,* 836 F.2d at 1270).

*United States v. Anderson,* 154 F.3d 1225, 1233 (10th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2048, 144 L.Ed.2d 215 (1999). *See United States v. Dighera,* 2 F.Supp.2d 1377, 1378 (D.Kan.1998). "Like the determination of probable cause, the question of whether there were 'exigent circumstances' is judged according to the totality of the circumstances." *In re Sealed Case 96–3167,* 153 F.3d 759, 766 (D.C. Cir.1998) (citation omitted).

■ Destruction of evidence is not the only exigent circumstance which may justify warrantless entry.

Exigent circumstances exist where law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant. Although exigency determinations invariably are fact-intensive, exigent circumstances commonly include:

(1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant.

*United States v. Tibolt,* 72 F.3d 965, 969 (1st Cir.1995) (citations and internal quotation marks omitted), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996).

### Analysis

■ Although the issue is a close one,[5] the specific facts and circumstances known to the officers justified their warrantless entry into D'Armond's trailer. Based upon D'Armond's statements, officers knew that one person was inside the trailer. Yet when officers banged on the front door and around the exterior of the trailer, no one responded from within. At that point officers had two concerns: destruction of evidence and safety of the occupant. The danger of destruction of evidence is always present in any drug trafficking case. In this case, the danger of destruction of evidence was greater in that D'Armond had been arrested late at night and would not return until released from jail. Prior to the issuance of the search warrant, a friend of D'Armond's actually came to the site of the traffic stop to pick up two children who were riding as passengers in D'Armond's truck. Officers knew from

D'Armond that at least one person was at the time inside his trailer. Under these circumstances, securing the residence in anticipation of a search warrant was reasonable. And, once having made their presence known to any occupant of the trailer, the risk of destruction of evidence escalated dramatically.[6]

Second, the officers were justifiably concerned about the safety of the occupant of the trailer. The dangers associated with the manufacture of methamphetamine are well-known. *See Dighera,* 2 F.Supp.2d at 1382 ("The chemicals and processes used in manufacturing methamphetamine pose a serious health risk.") (*citing United States v. Jennings,* 83 F.3d 145, 152 n. 6 (6th Cir.) ("The manufacture of methamphetamine always includes use of dangerously toxic chemicals."), *as Amended on Denial of Rehearing and Rehearing en Banc,* 96 F.3d 799 (6th Cir.), *cert. denied,* 519 U.S. 975, 117 S.Ct. 411, 136 L.Ed.2d 324 (1996)). Because no one responded to the officers' repeated banging on the trailer, and because there appears no doubt that the officers' commotion would have been heard by anyone inside, the officers were reasonably concerned about the safety of any occupant. In short, the combination of exigent circumstances justified the officers' warrantless entry into D'Armond's trailer.

Once inside, the officers' decision to remove Lindberg, who at the time appeared to be either drugged or very, very sleepy, from the trailer that reeked of metham-

---

5. So that it is clear, the officers' safety concerns about the possible methamphetamine lab would not, standing alone, have justified a warrantless entry in this case.

6. The court recognizes the potential for "government manipulation" of exigent circumstances, in that officers could potentially help to create the circumstances which might justify their warrantless entry. *See Anderson,* 154 F.3d at 1234. In this case, however, the court believes the combination of circumstances justified the officers' warrantless entry.

At least two important facts distinguish *Anderson.* In *Anderson,* given the large size of the office building, officers who deemed it

appropriate to make a warrantless entry could not have reasonably expected the defendant to hear their knocks. In the case at bar, there is no doubt that the officers' presence could not be heard inside D'Armond's trailer. Second, in *Anderson,* the defendant was believed to possess child pornography. Although distribution and production of child pornography are serious crimes " 'which can have devastating effects upon society and, most importantly, upon children who are sexually abused,' " *Anderson,* 154 F.3d at 1233 (*quoting United States v. Moore,* 916 F.2d 1131, 1139 (6th Cir.1990)), the production of methamphetamine poses an immediate health and safety concern for anyone exposed to the process.

phetamine was not unreasonable. Outside, and decidedly less groggy than when first aroused by the police, Lindberg consented to the search of his person. Even if Lindberg had not consented to that search, the search of his person was valid incident to his arrest.

### Inevitable Discovery

■ Evidence obtained illegally and subject to exclusion can be introduced at trial if the prosecution can show that, absent the illegality, an independent investigation inevitably would have led to discovery of the evidence through lawful means. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Larsen,* 127 F.3d 984, 986 (10th Cir.1997) (holding that independent investigation need not be ongoing at time of illegal police conduct), *cert. denied,* 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 159 (1998).

### Analysis

Assuming, *arguendo,* that the officers' entry into D'Armond's trailer was not justified by exigent circumstances, the evidence obtained during the subsequent execution of the search warrant would not be suppressed. Even if the two sentences regarding the officers' observations of the interior of D'Armond's trailer were excised from the search warrant application, the search warrant application still contains substantial evidence constituting probable cause justifying the issuance of a search warrant. *Cf. United States v. Finnigin,* 113 F.3d 1182, 1186 (10th Cir.1997) (excising defendant's suppressed statements, search warrant application affidavit still contained more than enough information to " 'ensure that the magistrate issuing the warrant had a "substantial basis" for concluding that probable cause existed.' ") (*quoting United States v. Anderson,* 981 F.2d 1560, 1568 (10th Cir.1992)). Consequently, the search of the trailer and its

occupant pursuant to the search warrant was not unlawful.

The defendants' motions to suppress are denied.

### Motion for Enlargement of Time in Which to File Additional Motions (Dk. 130).

In this motion, in the event his motion to suppress is denied, D'Armond seeks leave to file additional motions because his counsel has not had a sufficient opportunity to review the "voluminous" discovery provided by the government. If his motion to suppress is denied, D'Armond indicates that "multiple additional pretrial motions may be necessary unless the matters otherwise agreed to be submitted for purposes of preserving issues on appeal." The government did not file a written response to this motion.

This motion is denied without prejudice. The court is not satisfied that the complexity of this case or the volume of discovery justifies a blanket extension of time to file additional motions. The court will consider permitting D'Armond to file additional pretrial motions out of time for good cause shown.

IT IS THEREFORE ORDERED that D'Armond's Motion to Suppress (Dk. 16) and Supplemental Motion to Suppress Illegally Seized Evidence and Memorandum in Support Thereof (Dk. 129) are denied.

IT IS FURTHER ORDERED that D'Armond's Motion for Enlargement of Time in Which to File Additional Motions (Dk. 130) is denied without prejudice.

IT IS FURTHER ORDERED that Lindberg's Motion to Suppress Evidence (Dk. 61) is denied.

### MEMORANDUM AND ORDER

On November 19, 1998, the grand jury returned a superseding indictment [1] charg-

---

1. The original indictment only named D'Armond as a defendant. The superseding indictment added Lindberg as a defendant. The superseding indictment also adds two counts concerning the alleged possession of iodine and ephedrine with the intent to manufacture methamphetamine.

ing Ray Lee D'Armond, Jr. and Brian Keith Lindberg with conspiring to manufacture in excess of 10 grams of methamphetamine (in violation of 21 U.S.C. § 841(a)(1)), attempting to manufacture methamphetamine (in violation of 21 U.S.C. § 841(a)(1)), and creating a substantial risk of harm to human life by attempting to manufacture methamphetamine (in violation of 21 U.S.C. § 858). D'Armond is also charged with one count of being a felon in possession of a firearm (in violation of 18 U.S.C. § 922(g)(1)), one count of using and carrying a firearm during and in relation to a drug trafficking crime (in violation of 18 U.S.C. § 924(c)) and two counts of possessing listed chemicals (iodine and ephedrine) with the intent to manufacture methamphetamine (in violation of 21 U.S.C. § 841(d)(1)).

On August 13, 1999, this court entered a memorandum and order ruling on several pending motions in this case. *See United States v. D'Armond,* 65 F.Supp.2d 1189 (D.Kan.1999). On October 13, 1999, this court entered a memorandum and order which, *inter alia,* denied D'Armond's and Lindberg's motions to suppress. *See United States v. D'Armond,* 80 F.Supp.2d 1157 (D.Kan.1999).

This case comes before the court upon the following motions:

(1) **D'Armond's "Motion to Reconsider Denial of Accused's Motion to Suppress Illegally Seized Evidence and Memorandum in Support Thereof."** (Dk. 138).

(2) **Lindberg's Motion for Severance** (Dk. 137).

The government filed a consolidated response to the defendants' motions (Dk. 139). Both motions were submitted on the briefs. Having considered the briefs of counsel, the court's prior rulings, and the applicable law, the court is now prepared to rule.

**D'Armond's "Motion to Reconsider Denial of Accused's Motion to Suppress Illegally Seized Evidence and Memorandum in Support Thereof." (Dk. 138).**

In his motion to reconsider, D'Armond argues that the court's order denying his motion to suppress was wrongly decided. D'Armond contends that he was unlawfully detained, that his continued encounter with Officer Chapman was not consensual following the time Officer Chapman returned his papers, that any consent to search was the product of repeated prodding by Officer Chapman, and that the pat down search by Officer Chapman was unlawful. The defendant also challenges the subsequent warrantless entry into his trailer. Attached to the defendant's motion is an affidavit in which the defendant sets forth his own version of the significant events relevant to his motion to suppress.

The government opposes the defendant's motion to reconsider, arguing that the court's memorandum and order denying the defendant's motion to suppress was correctly decided. The government notes that the defendant did not testify during the motion to suppress hearing and argues that it would be unfair for the court to now consider his affidavit when he is not subject to cross-examination.

### Analysis

Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions. This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case. "A motion to reconsider shall be based on (1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." D.Kan. Rule 7.3. "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. General Motors Corp.,* 846 F.Supp. 1482, 1483 (D.Kan.), *aff'd,* 43 F.3d 1484, 1994 WL 708220 (10th Cir. Dec. 21, 1994) (table).

A court's rulings "are not intended as first drafts, subject to revision and reconsideration at a litigant's pleasure."

*Quaker Alloy Casting v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D.Ill. 1988). A motion to reconsider is appropriate if the court has obviously misapprehended a party's position, the facts, or applicable law, or if the party produces new evidence that could not have been obtained through the exercise of due diligence. *Comeau v. Rupp*, 810 F.Supp. 1172, 1175 (D.Kan.1992); *see Refrigeration Sales Co. Inc. v. Mitchell–Jackson, Inc.*, 605 F.Supp. 6, 7 (N.D.Ill. 1983), *aff'd*, 770 F.2d 98 (7th Cir.1985). A motion to reconsider is not appropriate if the movant only wants the court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally. *Comeau v. Rupp*, 810 F.Supp. at 1175.

*Koch v. Koch Industries, Inc.*, 6 F.Supp.2d 1207, 1209 (D.Kan.1998). The decision whether to grant or deny a motion to reconsider is committed to the court's sound discretion. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir.1988).

■■■ The defendant's motion to reconsider is little more than a request for the court to revisit the same issues previously rejected. On this basis alone, the defendant's motion to reconsider is denied. Believing that its prior order was correctly decided, the court will nevertheless briefly address the points raised in the defendant's motion to reconsider.

### Unlawful detention

D'Armond contends that because Corporal Chapman's initial stop of his vehicle was primarily motivated to investigate drug trafficking, and not for a valid traffic stop, he was unlawfully detained for a period of time beyond that necessary to investigate his traffic violation.

The court is satisfied that Corporal Chapman's initial stop of D'Armond's truck for a defective tag light was valid and that his investigation during that stop was not unreasonably lengthy or intrusive.

### Consensual Encounter/Unlawful Detention

At the time that D'Armond consented to the search of his truck, the defendant was free to leave and could have continued on his way. Viewing the totality of circumstances, no reasonable person would not have understood that they were free to leave after Corporal Chapman returned his papers and thanked him for his cooperation. Corporal Chapman was not overbearing or unfriendly at any point during the encounter and politely asked for consent to search D'Armond's truck.

### Consensual Search

The court remains convinced that the government carried its burden of proving that D'Armond's consent to search his truck was voluntary. D'Armond's own questions in response to Corporal Chapman's request to search the truck extended the colloquy between the two; the court does not believe the questions and answers exchanged between the two coerced D'Armond into consenting to the search of his truck or otherwise rendered D'Armond's consent to search involuntary. At the time he consented to the search of his truck, D'Armond was not unlawfully detained but instead was free to go. After D'Armond gave consent to search his truck, Corporal Chapman indicated to D'Armond that he needed to check his person for weapons. At that moment, D'Armond could have withdrawn his consent to search his truck, obviating the need to conduct a *Terry* search, and proceeded on his way. Instead, D'Armond did not withdraw his consent and cooperated with Corporal Chapman during the *Terry* search—at least until the time the vial of methamphetamine in D'Armond's pocket was discovered during that search. Upon discovery of the vial of methamphetamine, Corporal Chapman had probable cause to arrest D'Armond.

### Necessity of the Terry-search

The pat down search of D'Armond by Corporal Chapman prior to commencing

the search of the truck was not unlawful or unreasonable as it was warranted by the facts and circumstances known by Corporal Chapman. The traffic stop occurred at night. D'Armond, a suspected drug dealer, continually placed his hand in his right front pocket during the initial traffic stop. During the search, Corporal Chapman would have undoubtedly had to turn his back to D'Armond while he conducted the search. Combined, these facts clearly justified a brief Terry-search of D'Armond's person for weapons.

*Warrantless entry into D'Armond's trailer*

The court stands by its previous findings regarding the officers' warrantless entry into D'Armond's trailer. The defendant's motion to reconsider does not challenge the court's conclusion that the items seized from D'Armond's trailer would have been inevitably discovered during the subsequent execution of the search warrant and that the search warrant, excised of all information gleaned during the officers' warrantless entry, still contained sufficient evidence constituting probable cause to justify its issuance.

*D'Armond's Affidavit*

Although Fed.R.Crim.P. 47 permits the use of affidavits in support of motions in criminal cases, including motions to suppress, *see* 3A Charles Alan Wright, *Federal Practice and Procedure* § 802 (2nd ed. 1982) ("[A]ffidavits may be useful and informative on a motion to suppress evidence ...."), the court does not wholly countenance D'Armond's use of an affidavit at this juncture in this case. D'Armond did not file his affidavit until after he received an unfavorable ruling on his motion to suppress. As the government suggests, this is a thinly veiled attempt by the defendant to present his position and avoid the rigors of cross-examination. It is generally inappropriate for the defendant to have consciously passed on the opportunity to testify at the suppression hearing but expect the court to rely on his post-ruling affidavit in reconsidering its prior rulings. A motion to reconsider is not intended to provide the non-prevailing party with a

second chance to present his or her strongest case. Adherence to this general tenet is particularly appropriate in this case as all of the facts relevant to evaluating the defendant's motion to suppress were ostensibly admitted during the suppression hearing and no facts upon which the court based its decision should have come as any surprise to the defendant.

Notwithstanding these admonishments, the court has considered D'Armond's belated affidavit in evaluating his motion to reconsider and denies the relief sought in that motion. The court's memorandum and order denying D'Armond's motion to suppress was correctly decided and nothing presented by D'Armond convinces the court that it is appropriate to grant the relief sought in D'Armond's motion to reconsider

**Lindberg's Motion for Severance (Dk. 137).**

Lindberg seeks a severance from his codefendant under Fed.R.Crim.P. 14. In support of his request, the defendant correctly notes that his codefendant is charged with additional crimes—namely felon in possession of a firearm and carrying a firearm during and in relation to a drug trafficking crime—and that he is not. Lindberg also contends that the evidence in this case is substantially greater against his codefendant and that he may be found guilty simply by his association with D'Armond. In the alternative, Lindberg asks the court to consider giving appropriate limiting instructions regarding this joint trial.

The government opposes the defendant's motion for severance, arguing that the defendant has not carried his burden of demonstrating that a separate trial is warranted. The government also contends that appropriate jury instructions regarding this joint trial.

### Legal Standards

■ Fed.R.Crim.P. 8 provides that "two or more defendants may be charged in the same indictment or information if

they are alleged to have participated in the same act or transactions constituting an offense or offenses." In the Tenth Circuit, defendants charged jointly under Rule 8 are not entitled to separate trials as a matter of right. To determine whether joinder is appropriate under Rule 8, the court must consider the facts and circumstances of each case. *See United States v. Bailey*, 952 F.2d 363, 364–65 (10th Cir. 1991).[2]

▮▮▮ Under proper circumstances, the court may grant severance even if joinder under Rule 8 is appropriate. *United States v. Hollis*, 971 F.2d 1441, 1456 (10th Cir.1992), *cert. denied*, 507 U.S. 985, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). Fed.R.Crim.P. 14 provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance or provide whatever other relief justice requires ...

"In determining the merits of a motion for severance, the court must weigh the prejudice to a particular defendant caused by the joinder against the important considerations of economy and expedition in judicial interests." *United States v. Mabry*, 809 F.2d 671, 681 (10th Cir.), *cert. denied*, 484 U.S. 874, 108 S.Ct. 33, 98 L.Ed.2d 164 (1987), *and overruled on other grounds, Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). Severance is a matter of discretion, not of right, and the defendant bears a heavy burden of demonstrating prejudice to his case. *Hollis*, 971 F.2d at 1456. "The Supreme Court has emphasized that trial courts have 'a continuing duty at all stages of the trial to grant a severance if prejudice does appear.'" *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir.) (*quoting Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960)), *cert. denied*,

493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

▮▮▮ The fact that evidence against one defendant is more incriminating than another is not, standing alone, a basis for severance. *United States v. Dill*, 693 F.2d 1012 (10th Cir.1982); *see also United States v. Cox*, 934 F.2d 1114, 1120 (10th Cir.1991) (that the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14). Severance is not required because a defendant might have a better chance of acquittal if the trials had been severed. *Peveto*, 881 F.2d at 857; *United States v. Petersen*, 611 F.2d 1313 (10th Cir.), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1979). Similarly, a complaint that the "spillover effect" from the evidence that was overwhelming or more damaging against the co-defendant than the evidence against the moving party is insufficient to warrant severance. *United States v. Hack*, 782 F.2d 862, 870 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *United States v. Cox*, 934 F.2d at 1119.

Moreover, the court may instruct the jury that it should consider individually the charges against each defendant and the evidence presented, and not consider any evidence admitted solely against one defendant against another defendant. *See United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir.1992) (severance not required if some evidence is admissible against some defendants and not others); *see also United States v. Cardall*, 885 F.2d 656 (10th Cir.1989) (the assumption that juries can and will follow the instructions they are given is fundamental to our system).

▮▮▮ Besides being a "preference in the federal system," joint trials "'play a vital role in the criminal justice system.'" *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (*quoting Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176

---

**2.** The defendant in this case does not argue that he is not properly joined under Rule 8.

(1987)). Joint trials promote economy and efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent trials." *Richardson*, 481 U.S. at 209, 107 S.Ct. 1702. Such interests are obviously served in having a joint trial of defendants who are indicted together and are alleged to have participated mutually in the charged offense. *See U.S. v. Jenkins*, 904 F.2d 549, 557 (10th Cir.), *cert. denied*, 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990). Consequently, "[c]ourts generally adhere to the principle that 'those indicted together, especially co-conspirators, should be tried together.'" *Peveto*, 881 F.2d at 857 n. 16 (quoting 8 J. Moore, W. Taggert & J. Wicker, Moore's Federal Practice ¶ 14.05, ¶ .14-82 (2 ed. 1989)); *see Jenkins*, 904 F.2d at 556–557 (persons jointly indicted should be tried together); *United States v. Brantley*, 986 F.2d 379, 383 (10th Cir.1993) (defendants indicted together should be tried together).

■■■ The Supreme Court discussed the issue of severance under Rule 14 in *Zafiro*:

We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. *See Kotteakos v. United States*, 328 U.S. 750, 774–75, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. *See, e.g., Tifford v. Wainwright*, 588 F.2d 954 (5th Cir.1979) (per curiam). The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, [481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)] less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *See* 481 U.S. at 211, 107 S.Ct. 1702.

*Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. Rule 14 does not compel severance even when the risk of prejudice is shown, for the trial court still retains the discretion to create a remedy which will abate the risk of prejudice. *Id.* at 538–39, 113 S.Ct. 933.

■■■ The mere fact that one defendant seeks to cast blame on the other does not create prejudice. In *United States v. Linn*, 31 F.3d 987 (10th Cir.1994), the Tenth Circuit rejected a claim of "mutually antagonistic" defenses as a ground for a severance:

Here, the mutual antagonism complained of by defendants amounts to no more than finger pointing. The Sturlins maintained that they had nothing to do with the fire at all and that Mr. Linn and others committed the arson as part of a scheme to coerce Guy Sturlin to invest money. Likewise, Mr. Linn contended that he had nothing to do with the fire and that the Sturlins and Mr. Kerns committed the arson. Of course, Defendants also posited that each had nothing to do with the fire and that it was either accidental or due to an unknown arsonist. These defenses simply are not so contradictory that the jury

must have believed all of Defendants' theories and acquitted all of them, but, unfortunately for Defendants, did not. 31 F.3d at 992.

### Analysis

■ Under these legal standards, Lindberg has not carried his burden of demonstrating that severance is appropriate in this case. From its past experience with multiple defendant trials, the court is confident that appropriate limiting instructions will address the defendant's concerns in this case. The court denied the defendant's request for severance. The court will consider any limiting instructions offered by the defendant.

IT IS THEREFORE ORDERED that the relief sought in D'Armond's "Motion to Reconsider Denial of Accused's Motion to Suppress Illegally. Seized Evidence and Memorandum in Support Thereof" (Dk. 139) is denied.

IT IS FURTHER ORDERED that Lindberg's Motion for Severance (Dk. 137) is denied.