IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. ROGER D. MCCRARY, ET AL.

**Interlocutory Appeal from the Criminal Court for Smith County**
**Nos. 99-12 and 99-13     J. O. Bond, Judge**

**No.01C01-9906-CR-00202**
**No. M1999-00001-CCA-R9-CD - Decided May 19, 2000**

On April 5, 1999, a Smith County Grand Jury indicted the appellees, Roger D. McCrary and Vernice A. Logan, on one count of possessing with intent to sell more than seventy (70) pounds of marijuana. The indictment resulted from a traffic stop of the appellees' vehicle and the consequent seizure by police of one hundred and forty-five point six (145.6) pounds of marijuana. The appellees filed motions to suppress the State's use of the marijuana at trial. Following a suppression hearing on May 10, 1999, the Smith County Criminal Court granted the appellees' motions. From the trial court's orders, the State of Tennessee now brings this interlocutory appeal. Following a review of the record and the parties' briefs, we reverse the orders suppressing the evidence and remand these cases to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9; Judgment of the Criminal Court is Reversed and Remanded**.

OGLE, J., delivered the opinion of the court, in which WADE, P.J., and PEAY, J., joined.

Paul G. Summers, Attorney General and Reporter, Kim R. Helper, Assistant Attorney General, David Earl Durham, Assistant District Attorney General, for the appellant, State of Tennessee.

Thomas H. Bilbrey, Assistant Public Defender, Lebanon, Tennessee, for the appellee, Roger D. McCrary.

J. Branden Bellar, Carthage, Tennessee, for the appellee, Vernice A. Logan.

### OPINION

### I.  Factual Background

On December 19, 1998, at approximately 10:00 a.m., Shannon Brinkley, a trooper with the Tennessee Highway Patrol, observed a white Chevrolet Blazer traveling in the right, eastbound lane of Interstate 40 at a speed of approximately sixty (60) or seventy (70) miles per hour. The Blazer was following closely behind another vehicle. Because it had been raining and the roads were wet, Trooper Brinkley decided that the proximity of the Blazer to the other vehicle posed a danger and, accordingly, conducted a traffic stop.

Upon approaching the Blazer, Trooper Brinkley observed appellee McCrary in the driver's seat and appellee Logan in the front passenger's seat. The trooper instructed McCrary to get out of the vehicle and also requested McCrary's driver's license. McCrary provided an Arizona driver's license and, in response to the trooper's request for proof of vehicle registration, stated that Logan had rented the Blazer. McCrary further informed Trooper Brinkley that he and Logan were en route to Detroit, Michigan from Phoenix, Arizona and intended to visit family in Detroit during the Christmas holidays. Trooper Brinkley then approached Logan and obtained both her driver's license and the car rental agreement. Logan confirmed that she had rented the Blazer and also confirmed the appellees' origin and destination. She explained that she intended to visit her grandchildren in Detroit.

Trooper Brinkley returned to his patrol car, ran a computer check on McCrary's driver's license, and completed a "warning citation." He additionally read the car rental agreement provided by Logan and noted that Logan was listed as the sole authorized driver of the Blazer. Finally, he returned to the Blazer, where he issued the warning citation to McCrary and returned McCrary's driver's license. He also asked Logan to get out of the Blazer and advised her that, according to the car rental agreement, McCrary was not authorized to drive the Blazer. He indicated that neither she nor McCrary had violated any law but noted that she might encounter difficulties if McCrary were to have an accident while he was driving the Blazer. Trooper Brinkley then returned to Logan both her driver's license and the car rental agreement. During the preliminary hearing in the appellees' cases, Trooper Brinkley testified that

> when I gave [McCrary] the warning and his license and I gave [Logan] her license and the rental agreement, at that point, they were free to leave because that ended the traffic infraction there.

Upon returning Logan's driver's license and car rental agreement, Trooper Brinkley initiated another conversation with Logan, during which he commented upon the high incidence of transportation of alcohol, narcotics, and weapons upon the interstate highways and requested permission to search the Blazer. He stated to Logan that his request "was nothing personal against her . . . ." At the preliminary hearing, Trooper Brinkley recounted that

> [Logan] was a little skeptical at first. She said, sir, I'm just going to visit my grandchildren. I said I understand. I said, if you tell me yes, I'll search your vehicle and be very quick about it. I said, but if you tell me no, I will not search your vehicle. And she said, you want to search my truck? And I said, yes, ma'am. She hesitated, and I said, tell me. I said, if you have any objections, please tell me, I said, because if you tell me not to search it, I'm not going to search it. And she said, well, okay. Go ahead and search it. She said, but make it quick. And I was, like, yes, ma'am, I'll be as quick as possible.

When he received Logan's consent, Trooper Brinkley requested that both appellees stand outside the vehicle during the search. The appellees complied, standing at the rear of the Blazer. Trooper Brinkley then began his search, initially examining the area around the front passenger's seat. The trooper also unfastened several bags located in the rear passenger seat,

unsuccessfully feeling inside for any contraband. Finally, the trooper directed his attention toward the cargo area of the Blazer.

The cargo area was concealed from open view by a "factory cargo cover," which was fastened with a hook to the rear door of the vehicle. From the rear passenger seat of the Blazer, Trooper Brinkley felt inside the cargo area. He then moved to the rear of the Blazer, opened the rear window, reached inside the vehicle, and released the cover, revealing one green and two black duffel bags. The trooper opened the rear door of the Blazer and attempted to open one of the duffel bags but noticed that the bag was secured with a "small luggage lock." The trooper felt the outside of the bag and perceived two large, square objects. Trooper Brinkley testified at the suppression hearing that the objects were "really hard . . . compressed." Trooper Brinkley additionally felt the outside of one of the other two bags and again perceived two large, square objects. He inquired whether either Logan or McCrary had the key to the lock on the first bag. When the appellees denied having a key, Trooper Brinkley lifted the bag in order to feel its weight. He noted that the bag was very heavy and, placing the bag on the ground, inquired concerning its contents. Logan responded that the bag contained "reefer." Trooper Brinkley testified both at the preliminary hearing and at the suppression hearing that "reefer" is a term commonly used to refer to marijuana.

As a result of Logan's statement, Trooper Brinkley arrested the appellees, placing both McCrary and Logan in handcuffs and advising them concerning their Miranda rights. He additionally called a dispatcher on his radio and requested assistance from the Smith County Sheriff's Department. Finally, he used a knife to cut open the duffel bags. Each bag contained two square objects covered in Christmas wrapping paper. Trooper Brinkley cut through the wrapping paper on one of the objects and confirmed the presence of a substance that appeared to be marijuana. The police ultimately determined that the three duffel bags found in the cargo area of the Blazer contained a total amount of one hundred and forty-five point six (145.6) pounds of marijuana.

At the hearing on the appellees' motions to suppress, Trooper Brinkley testified that, *after* the appellees' arrest and the discovery of the marijuana, Logan asked what the trooper would have done had she refused to consent to the search of the Blazer. The trooper recalled that

> I told her that . . . if she had said no to the consent that they were still free to go, and that I'd probably, if I could have gotten the canine there in a reasonable amount of time, I would have asked for a drug dog to come to the scene.

In granting the appellees' motions to suppress the State's use at trial of the marijuana, the trial court entered the following findings:

> 1.) Trooper Shannon Brinkley did have reasonable suspicion to stop the subject vehicle which was the object of the search in question.
>
> 2.) The consent to search the vehicle given to Trooper Brinkley by the co-defendant in this case to wit: Vernice Logan was voluntary.
>
> 3.) The Trooper did not have probable cause or reasonable suspicion

to request consent to search the vehicle after the warning citation had been issued to the defendant Roger D. McCrary.

4.) The consent to search the vehicle given by Vernice Logan to Trooper Brinkley did not extend to the closed duffel bags in the rear compartment of the vehicle.

5.) The evidence in this case to wit: approximately one hundred forty five (145) pounds of marijuana, and all other items taken from the subject vehicle were therefore unlawfully seized.

On June 3, 1999, the State filed in the Smith County Criminal Court a motion requesting permission to appeal the trial court's orders pursuant to Tenn. R. App. P. 9, which motion the trial court granted. The State then filed in this court an application for permission to appeal pursuant to Tenn. R. App. P. 9. This court granted the State's application on July 7, 1999.

## II. Issues

The State's claim of error is predicated upon the following grounds:
(1) Trooper Brinkley required neither reasonable suspicion nor probable cause to believe that the appellees were engaged in criminal activity in order to request consent to search the Blazer.
(2) Logan's consent was voluntary and authorized the trooper's search of the Blazer, including the covered cargo area.
(3) The trooper possessed probable cause to believe that the locked duffel bags contained marijuana, justifying his search of the duffel bags.

## III. Analysis

When reviewing a trial court's ruling on a motion to suppress evidence obtained by police pursuant to a warrantless search or seizure, this court is obliged to uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996); State v. Ashworth, 3 S.W.3d 25, 29 (Tenn.Crim.App. 1999). That having been said, an appellate court's review of the trial court's ruling is not limited to the record of the suppression hearing but extends to the entire record of proceedings, including, in this case, the preliminary hearing. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, this court reviews de novo the trial court's application of the law to the facts. Keith, 978 S.W.2d at 864.

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures conducted by law enforcement officers. Under both the United States and Tennessee constitutions, courts have generally defined unreasonable searches and seizures as those conducted without a warrant, a definition subject to a few carefully defined exceptions. See Keith, 978 S.W.2d at 865; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). See also Maryland v. Dyson, 527 U.S. 465,

\_, 119 S.Ct. 2013, 2014 (1999). The constitutional prohibitions against unreasonable searches and seizures and the accompanying warrant requirement encompass stops and searches of automobiles. Id. See also State v. Pulley, 863 S.W.2d 29, 30 (Tenn.1993). Accordingly, when the State seeks to introduce in a criminal trial evidence obtained as a result of the warrantless stop and search of an automobile, the State carries the burden of demonstrating by a preponderance of the evidence the applicability of an exception to the warrant requirement. Keith, 978 S.W.2d at 865; Yeargan, 958 S.W.2d at 629.

Once such exception occurs when a police officer conducts a stop of an automobile based upon a reasonable suspicion or probable cause to believe that a traffic violation has occurred. State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). In this case, it is undisputed that Trooper Brinkley possessed, at a minimum, a reasonable suspicion that the appellees were violating Tenn. Code Ann. § 55-8-124 (1998), prohibiting "follow[ing] another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."[1] In other words, it is undisputed that the traffic stop of the appellees' vehicle was reasonable at its inception. The parties dispute, however, whether Trooper Brinkley's comment concerning the incidence of contraband transportation on the interstate highways and his request for consent to search the Blazer exceeded the scope of the traffic stop, requiring a reasonable suspicion or probable cause to believe that the appellees were transporting contraband.

As noted earlier, at the time Trooper Brinkley requested permission to search the Blazer, he had already issued the warning citation to McCrary and had returned to McCrary and Logan both their driver's licenses and the car rental agreement. When a police officer issues a traffic citation or warning and returns a driver's license and registration, a traffic stop ceases to be a seizure for purposes of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution and becomes a consensual encounter unless a driver has "objectively reasonable" cause to believe that he or she is not free to leave. Ashworth, 3 S.W.3d at 29-30 (citing United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998), and United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997)). See also, e.g., United States v. White, 81 F.3d 775, 778-779 (8th Cir. 1996); United States v. Werking, 915 F.2d 1404, 1408-1409 (10th Cir. 1990); United States v. Poulack, 82 F. Supp. 2d 1024, 1030 (D. Neb. 1999); United States v. D'Armond, 80 F. Supp. 2d 1157, 1164-1165 (D. Kan. 1999); Ferris v. State, 735 A.2d 491, 499-506 (Md. 1999); Commonwealth v. Hoak, 700 A.2d 1263, 1266-1271 (Pa. Super. Ct. 1996). The determination of the point at which the traffic stop ceases to be a seizure is ultimately a question of law. State v. Daniel, 12 S.W.3d 420, 423-424 (Tenn. 2000)("the trial court's conclusion that a seizure did not occur is a conclusion of law derived from an application of the law to the undisputed facts of this case"). Compare State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999)("we consider the issue of whether an arrest was made for Fourth Amendment purposes to be one primarily of fact").

As a matter of law, a subjective intent by a police officer to detain an individual if he

---

[1]At the suppression hearing, the trial court noted that "[t]here's not any doubt" that Trooper Brinkley had probable cause to believe that a traffic violation had occurred.

or she attempts to leave is irrelevant unless conveyed to the individual. <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6 (1980). Moreover, the officer's failure to affirmatively inform a motorist that he or she is free to leave will not necessarily transform a consensual encounter into a seizure. <u>See, e.g.</u>, <u>Immigration and Naturalization Service v. Delgado</u>, 466 U.S. 210, 216-221, 104 S.Ct. 1758, 1762-1765 (1984). In other words, a police officer's inquiry concerning the presence of contraband in a motorist's vehicle and a request for consent to search the vehicle will not *alone* suffice to establish a seizure. <u>Ashworth</u>, 3 S.W.3d at 29-30 (citing <u>Sullivan</u>, 138 F.3d at 133, and <u>Anderson</u>, 114 F.3d at 1064). <u>See also, e.g.</u>, <u>White</u>, 81 F.3d at 778-779; <u>Werking</u>, 915 F.2d at 1408-1409; <u>Poulack</u>, 82 F. Supp. 2d at 1030; <u>D'Armond</u>, 80 F. Supp. 2d at 1164-1165; <u>Ferris</u>, 735 A.2d at 499-506; <u>Hoak</u>, 700 A.2d at 1266-1271. Because the record in this case reflects nothing more, we must conclude that Trooper Brinkley's request to search the Blazer occurred in the context of a consensual encounter, requiring neither a reasonable suspicion nor probable cause to believe that the appellees were engaged in criminal activity.[2]

We further conclude that the record in this case does not preponderate against the trial court's finding that Logan's consent to the search of the Blazer was, in fact, "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" <u>State v. Simpson</u>, 968 S.W.2d 776, 784 (Tenn. 1998)(citing <u>State v. Brown</u>, 836 S.W.2d 530, 547 (Tenn. 1992)); <u>Ashworth</u>, 3 S.W.3d at 30. <u>See also</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 248-249, 93 S.Ct. 2041, 2059 (1973). It is well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to a voluntary consent. <u>State v. Bartram</u>, 925 S.W.2d 227, 230 (Tenn. 1996)(citing <u>Schneckloth</u>, 412 U.S. at 218, 93 S.Ct. at 2041). In contrast to the determination of when a seizure has occurred, the determination of whether a consent to a search was voluntarily given is a question of fact to be determined from the totality of circumstances. <u>Schneckloth</u>, 412 U.S. at 227, 248-249, 93 S.Ct. at 2047-2048, 2059; <u>Ashworth</u>, 3 S.W.3d at 29. In this case, Logan was confronted during the late morning hours with a request to search her vehicle by a lone trooper who assured her that he did not suspect her of criminal activity and invited her to refuse consent, stating that he would not search the Blazer if she refused consent. After an initial hesitation, Logan instructed the trooper, "Go ahead and search it . . . but make it quick." Contrary to the appellees' assertions in their briefs, Logan's initial hesitation in no way establishes that her subsequent consent was involuntary, but rather reflects her consideration of the option, confirmed by the trooper, to refuse consent. Moreover, we reject the appellees' suggestion that the voluntariness of Logan's consent was vitiated by Trooper Brinkley's communication to Logan *following* her arrest that, had she refused consent, he would have attempted to arrange the transportation of a drug detection dog to the location of the traffic stop. The subjective intentions of a police officer that are unknown to the consenting party at the time

---

[2]The appellees cite <u>State v. Morelock</u>, 851 S.W.2d 838 (Tenn. Crim. App. 1992), for the proposition that, once the purpose of the traffic stop had been fulfilled, Trooper Brinkley's questioning of Logan constituted an unlawful seizure and tainted Logan's subsequent consent to the search of the Blazer. However, we do not find <u>Morelock</u> to be controlling in this case, as it was apparently undisputed in <u>Morelock</u> that, at all times during the encounter between the police officer and the defendant, the defendant was the subject of a seizure.

-6-

of consent do not implicate the voluntariness of the consent.  See, e.g., United States v. Anderson, 114 F.3d 1059, 1064-1065 (10th Cir. 1997)(trooper's intent to search motorist's vehicle regardless of motorist's consent irrelevant in determining voluntariness of consent unless communicated to the motorist).

A determination that Logan's consent was voluntary, however, does not resolve the question raised concerning the scope of her consent.  The scope of a party's consent is measured by a standard of "'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect."  Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-1804 (1991).  The understanding of a "typical reasonable person" will generally depend, in turn, upon the object of the search.  Id. at 251, 1804. Thus, in Jimeno, the United States Supreme Court concluded that, when an officer informs a motorist that he is searching for narcotics, it is objectively reasonable for the officer to conclude that a general consent to search the motorist's vehicle includes consent to search containers within the vehicle that might contain drugs.  Id.  Similarly, in this case, it was objectively reasonable for Trooper Brinkley to conclude that Logan's general consent to search the Blazer encompassed the covered, but easily accessible, cargo area of the vehicle and any unlocked containers or luggage inside the vehicle.  See e.g., United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir. 1999)(a police officer did not exceed the scope of a general consent when he removed an interior door panel of an automobile with his fingers, dislocating two plastic clips; "a search does not exceed the scope of consent merely because an officer forces open a secured compartment that may reasonably contain the objects of the search"); State v. Garcia, 986 P.2d 491, 493-494 (N.M. App. Ct.), cert. granted, (N.M. 1999)("courts have given broad scope to a consent to a general search of a vehicle for narcotics, interpreting the consent to include non-destructive dismantlement of parts of the vehicle, particularly when the defendant was present at the time and voiced no objection").  However, we must agree with the trial court that Logan's consent likely did not authorize Trooper Brinkley to cut open the locked duffel bags with a knife.<sup>3</sup>  In Jimeno, the Supreme Court observed that "[i]t is very unlikely to think that a suspect, by consenting to the search of [the trunk of his car], has agreed to the breaking open of a locked briefcase within the trunk . . . ."  Id. at 251-252, 1804.  See also Zapata, 180 F.3d at 1243 ("a search exceeds the scope of consent when an officer destroys a vehicle, its parts, or its contents"); Garcia, 986 P.2d at 494 ("when the search involves intentional damage to property, the courts require more certain evidence that the scope of the consent extended so far").  See generally Wayne R. LaFave, 3 Search and Seizure, § 8.1(c), at 612-614 (3d ed. 1996).  But cf.

_____

<sup>3</sup>In contrast, we do not believe that feeling the outside of the duffel bags or the mere movement of one of the locked duffel bags from the luggage compartment of the Blazer to the ground exceeded the scope of Logan's consent or was otherwise unrelated to the objectives of the authorized intrusion.  Arizona v. Hicks, 480 U.S. 321, 325, 107 S.Ct. 1149, 1152 (1987); State v. McKinney, 917 P.2d 1214, 1224 (Ariz. 1996); People v. Clark, 857 P.2d 1099, 1115-1116 (Cal. 1993).  See also, generally, Bond v. United States, No. 98-9349, 2000 WL 381264 (U.S., April 17, 2000)(publication pending)(physical manipulation of the outside of a bag is a search within the meaning of the Fourth Amendment to the United States Constitution).

-7-

United States v. Martinez, 949 F.2d 1117, 1120-1121 (11th Cir. 1992)(general consent to search a mini-storage unit encompassed consent to search a locked trunk, even though police had to break the lock on the trunk); State v. Singleton, No. 03C01-9406-CR-00221, 1994 WL 772861, at **5-6 (Tenn. Crim. App. at Knoxville, May 13, 1995)(defendant's consent to police officers' search of "anywhere and anything" on his farm included consent to search a freezer secured by a chain and a padlock, even though search required breaking open the padlock with a hammer).

Nevertheless, we agree with the State that Logan's statement to Trooper Brinkley concerning the contents of one of the duffel bags provided probable cause to believe that all three duffel bags contained marijuana. In Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 283-284 (1925), the United States Supreme Court held that police may stop and search an automobile without a warrant if the law enforcement officers have probable cause to believe that the automobile contains contraband. The rationale for the automobile exception is two-fold: (1) the impracticability of obtaining a search warrant in light of the *inherent* mobility of an automobile; and (2) the reduced expectation of privacy with respect to one's automobile. California v. Carney, 471 U.S. 386, 393, 105 S.Ct. 2066, 2070 (1985); South Dakota v. Opperman, 428 U.S. 364, 367, 96 S.Ct. 3092, 3096 (1976). See also State v. Leveye, 796 S.W.2d 948, 951 (Tenn. 1990). Since Carroll, the Supreme Court has extended this exception to include the search of containers within an automobile capable of concealing the object of the search. United States v. Ross, 456 U.S. 798, 824, 102 S.Ct. 2157, 2172 (1982). See also Wyoming v. Houghton, 526 U.S. 295, 307, 119 S.Ct. 1297, 1304 (1999). More importantly, in California v. Acevedo, 500 U.S. 565, 576, 111 S.Ct. 1982, 1989 (1991), the Court held that the automobile exception encompasses those circumstances in which probable cause extends only, as in this case, to specific containers within an automobile. Furthermore, in the context of the "automobile exception," "the nature of the container in which the contraband is secreted," including whether the container is locked or unlocked, is not controlling. Ross, 456 U.S. at 820-824, 102 S.Ct. at 2170-2172. Rather, "[t]he scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." Id. at 824, 2172. In short, the facts of this case support the application of the "automobile exception" to the warrant requirement.[4]

Finally, we note that Trooper Brinkley's search of the duffel bags was arguably a valid search incident to an arrest. When police officers make a lawful custodial arrest, they may search the person arrested and the immediately surrounding area without obtaining a warrant. Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040 (1969); Crutcher, 989 S.W.2d at 300. In New York v. Belton, 453 U.S. 454, 460-461, 101 S.Ct. 2860, 2864 (1981), the United States Supreme Court further held

---

[4]It is not significant for purposes of applying the "automobile exception" to the warrant requirement that the appellees were already under arrest at the time of the search. See Chambers v. Maroney, 399 U.S. 42, 47-52, 90 S.Ct. 1975, 1979-1981 (1970). See also Dyson, 527 U.S. at __, 119 S.Ct. at 2014.

that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporary incident of that arrest, search the passenger compartment of that automobile. It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the custodial arrest justifies the infringement of any privacy interest the arrestee may have.

For purposes of a search incident to an arrest, the passenger compartment of a sport-utility vehicle been held to include the cargo area, even when the area is overlaid by "an easily-retractable vinyl covering." United States v. Olguin-Rivera, 168 F.3d 1203, 1205-1207 (10th Cir. 1999). Similarly, it has been suggested that, under Belton, "a suitcase or other container possessed by the arrestee may be searched even if locked or otherwise secured from a time preceding the arrest to the time of the search." Wayne R. LaFave, 3 Search and Seizure, § 5.5(a), at 179 (3d ed. 1996). See also United States v. Tavolacci, 895 F.2d 1423, 1428-1429 (1990)(officers' contemporaneous search of a bag within the area immediately surrounding the arrestee qualified as a search incident to an arrest although the searched bag had been locked, the bag was opened by the defendant only at the direction of the officers, and it was plain that an immediate search of the bag was unnecessary to ensure the officers' safety).[5]

### IV. Conclusion

For the foregoing reasons, we reverse the trial court's orders suppressing the evidence and remand these cases to the trial court for further proceedings consistent with this opinion.

---

[5]But see Wayne R. LaFave, 3 Search and Seizure, § 7.1(c), at 451-452 (3d ed. 1996)