IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 25, 2007 Session

# STATE OF TENNESSEE v. MARON DONTA BROWN

**Direct Appeal from the Criminal Court for Bradley County**
**No. 02-009 R. Steven Bebb, Judge**

---

**No. E2006-01038-CCA-R3-CD - Filed March 31, 2008**

---

The appellant, Maron Donta Brown, pled guilty in the Bradley County Criminal Court to one count of possession of more than .5 grams of cocaine with the intent to sell or deliver and one count of speeding.[1] The appellant received a total sentence of fifteen years as a Range II multiple offender. As part of the plea agreement, the appellant properly reserved a certified question of law, challenging the stop and subsequent search of his vehicle during which the cocaine was discovered. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. Jerry L. Smith, J., filed a dissenting opinion.

M. Jeffrey Whitt, Knoxville, Tennessee, for the appellant, Maron Donta Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Joseph Hoffer and Andrew Freiberg, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

On June 18, 2001, Trooper Keven Hoppe stopped the appellant for speeding and conducted a search of the appellant's vehicle, discovering a taped package containing over 300 grams of cocaine. Subsequently, the appellant filed a motion to suppress the cocaine, alleging that the scope of the traffic stop was exceeded; he did not knowingly and voluntarily consent to the search; the scope of his consent, if any, was exceeded; and the consent, if any, was the result of the unlawful

---

[1] On appeal, the appellant apparently contests only his cocaine conviction.

stop.

At the suppression hearing, Trooper Hoppe testified that on June 18, 2001, he was parked about one mile inside the Bradley County line near mile marker 17 on Interstate 75. His vehicle, a 1998 Crown Victoria, was clearly marked as a K-9 unit. Trooper Gibson was also parked at that location, albeit in a separate police cruiser. The troopers were observing northbound traffic on the interstate. At approximately 5:00 p.m., Trooper Hoppe saw a Cadillac being followed closely by a dark Chevrolet Impala. Trooper Hoppe recalled that the Impala was traveling at a speed of seventy-eight miles per hour in a seventy-mile-per-hour zone, and the Cadillac was traveling at a similar speed. The Cadillac had a Texas license plate. Trooper Hoppe believed that the Cadillac and the Impala were traveling too closely for that rate of speed. Additionally, Trooper Hoppe testified that based upon his training in drug interdiction, he knew that "[d]rug cartels, mule drug haulers" often use a decoy vehicle to purposely draw an officer's attention from another vehicle by speeding or driving erratically. Trooper Hoppe noted that usually the decoy vehicle will purposely have a license plate from a high drug area such as Texas. Trooper Hoppe believed that one of the vehicles was a decoy vehicle.

Based upon the speeding and his suspicion that one of the vehicles was a decoy vehicle, Trooper Hoppe began pursuing the Impala, and Trooper Gibson began pursuing the Cadillac. The troopers employed the blue lights located on top of their vehicles. After pursuit was initiated, the Cadillac's speed increased to approximately 100 miles per hour. Trooper Hoppe recalled that after the initiation of pursuit, the driver of the Impala "failed to maintain his lane of travel," drifted, and reduced the vehicle's speed.

After several miles of pursuit, the Impala stopped on the side of the interstate. Trooper Hoppe said that the Impala had dark, tinted windows, but he was able to see the driver of the vehicle move around quite a bit in the vehicle. Because the Impala was parked close to interstate traffic, Trooper Hoppe approached the Impala on the passenger side. The appellant was alone in the vehicle.

Trooper Hoppe looked in the front passenger side window and told the appellant that he had "clocked" the appellant driving seventy-eight miles per hour. The appellant denied that he had been speeding. Trooper Hoppe noticed two or three cellular telephones in the front seat of the vehicle. He also noticed several air fresheners in the vehicle. He asked the appellant why he had been moving around so much in the vehicle after the stop. The appellant responded that he was moving because he had spilled a cup of water; however, Trooper Hoppe saw no evidence of spilled water. Trooper Hoppe observed that the appellant was acting very suspiciously, explaining that he was "nervous," "shaking," and had a concerned expression on his face.

Trooper Hoppe asked the appellant to step out of the vehicle on the passenger side and to produce his driver's license. When the appellant stepped out of the vehicle, Trooper Hoppe noticed a "bulge" in the appellant's pocket; therefore, he patted down the appellant for weapons. The appellant possessed no weapons but had a large ring of keys and a lighter in his front pants pocket. Trooper Hoppe asked the appellant who owned the vehicle. The appellant responded that the Impala

belonged to his stepfather. Trooper Hoppe asked the appellant from where he was traveling, and the appellant replied that he had just left his girlfriend at the University of Tennessee at Chattanooga. The trooper testified that he usually asks these types of questions of people he stops "to gauge what kind of person they are." Trooper Hoppe took the appellant's driver's license to the police cruiser and called dispatch to check the driver's license and the vehicle's license plate. He learned that the local computers were not working, so he had to call "Block High Watch Center" in New Orleans, Louisiana, to run the driver's license and license plate. While speaking with the trooper, the appellant crossed his arms several times and would not make eye contact with the trooper. Trooper Hoppe stated that he found the appellant's "body language . . . very suspicious in nature."

While awaiting a response from "Block High Watch Center," Trooper Hoppe asked the appellant if he had ever been in trouble and if there were illegal items in the vehicle. The appellant answered no. Trooper Hoppe next asked the appellant if he could "take a quick look," gesturing toward the vehicle. Trooper Hoppe testified that the appellant said, "Yeah, go ahead." The trooper inquired if there was anything in the vehicle such as marijuana, cocaine, methamphetamine, or heroin. The appellant replied in the negative. Trooper Hoppe asked the appellant if he was a "straight up guy," and the appellant responded affirmatively.

Trooper Hoppe began searching the vehicle while the appellant stood in front of a guardrail ten or twelve feet away. Trooper Hoppe immediately picked up an item that had previously attracted his attention: a brown cardboard box that looked like something in which an air filter for a vehicle would be packaged. The box was "oddly taped . . . with non-standard tape which said 'GM' on it." The trooper asked the appellant to explain what was in the box. Initially, the appellant said that he did not know what it was; the box had been in the vehicle when he got it. Then, the appellant said that he believed it was a present from his sister to his mother. Trooper Hoppe testified, "I knew at that point probably it was contraband." At the suppression hearing, the following colloquy occurred:

> [Trooper Hoppe:] I felt it first and I could feel like a brick, just one big brick in it, and then there's a broke down zip-lock bag. I felt the brick in there.
>
> [The court:] So you were feeling before you ever tore it open.
>
> [Trooper Hoppe:] I felt the brick in it. You could feel it.

After feeling the box, Trooper Hoppe peeled up a corner of the tape, smelled the box, and detected the odor of cocaine. Trooper Hoppe told the appellant to get down on the ground, and the appellant complied. Trooper Hoppe then handcuffed the appellant and attempted to convince the appellant to participate in a controlled delivery. The appellant refused.

Trooper Hoppe returned to his police cruiser and placed the package inside. "Block High Watch Center" called Trooper Hoppe, and he informed them that he "had a seizure." He finished opening the box and found

> a big zip-lock ba[g] with rock cocaine . . . just the way it's chunked up cut off a kilo. And the other one was a perfect kilo, what you would think a kilo would look like, and it looked like it was green material but it's got some kind of gel or like axle grease or something around it I guess to mask the odor of it, or that's what it looked like.

Trooper Hoppe acknowledged that he had a drug detection dog in his police cruiser, but he explained that he did not have an opportunity to use the dog. He also stated that he usually relies on verbal consent instead of using consent to search forms because a fellow officer had been shot and killed while returning to his police cruiser to obtain a consent form.

A videotape of the stop was played for the trial court. At the conclusion of the suppression hearing, the court said, "I don't see anything wrong at all with the stop." The court said that after listening to the videotape, he thought he heard the appellant say "okay" or "yes" to indicate that Trooper Hoppe could search the vehicle. The court stated:

> I'm going to be as frank as I can with you all. I don't know, I think this is a very close question no matter how the Court rules, and my feeling is that the close question is not whether they exceeded the scope of the consent. I don't have any problem with an appeal on that part at all because that's part of the question, but I feel like if the consent was valid that the officer did not exceed the scope, even if he had to unwrap the package. Then again I think of myself out on the interstate and a police officer stops me for speeding and I look around and I've got nothing in the car and I say, "Sure, go ahead and look around," do I expect that he's going to unwrap all my Christmas presents in the back seat. I don't know, and so that may be more significant than I think it is. And in this case when the officer picked that up he says he smelled it and that it felt like a brick. So I'm thinking that that probably isn't as an impressive issue to the Court of Appeals or the Supreme Court as maybe the voluntariness of the consent.

The court found that the appellant gave unequivocal consent to search his vehicle, knowing that the trooper was searching for drugs. Additionally, the court found that the consent was "uncontaminated by duress or coercion."

Following the trial court's ruling, the appellant pled guilty to speeding and to possession of more than .5 grams of cocaine with the intent to sell, properly reserving a certified question of law: (1) whether the scope of the traffic stop was exceeded; (2) whether the appellant knowingly and voluntarily consented to a search of the vehicle; (3) whether the scope of the consent was exceeded; and (4) whether the consent, if any, was "fruit of the poisonous tree" because it was directly related from the allegedly illegal detention.

## II. Analysis

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

### A. Scope of Detention

As his first issue, the appellant questions

> [w]hether the scope of the detention following the traffic stop for speeding was exceeded by Trooper Hoppe, without reasonable suspicion or probable cause, in violation of the [appellant's] rights under article I, section 7 of the Tennessee Constitution and the United State's Constitution, Fourth Amendment.

Initially, we note that both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Hicks, 55 S.W.3d 515, 527 (Tenn. 2001). Under both constitutions, evidence discovered as a result of a warrantless search is "'subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968), holding that a law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In other words, a law enforcement officer may stop a vehicle if the officer possesses a reasonable suspicion supported by specific and articulable facts that an offense has been, is being, or is about to be committed. Watkins, 827 S.W.2d at 294.

The Supreme Court has observed that "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695, 116 S. Ct. 1657, 1661 (1996); see also State v. Smith, 21 S.W.3d 251, 256 (Tenn. Crim. App. 1999). "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218 (citing Ornelas, 517 U.S. at 696, 116 S. Ct. at 1661). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norwood, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8, 109 S. Ct. 1581, 1585 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citations omitted).

Taking the foregoing into consideration, we note that the proof adduced at the suppression hearing was that Trooper Hoppe stopped the appellant's vehicle, at least in part, because the appellant was driving seventy-eight-miles-per-hour in a seventy-miles-per-hour zone. Because speeding is a traffic infraction, the original stop was valid. See State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007); State v. Cox, 171 S.W.3d 174, 180 (Tenn. 2005). Moreover, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Robert Lee Hammonds, No. M2005-01352-CCA-R3-CD, 2006 WL 3431923, at *8 (Tenn. Crim. App. at Nashville, Nov. 29, 2006). Therefore, Trooper Hoppe did not violate the scope of the stop by asking the appellant for his driver's license, from where he was traveling, or who was the owner of the vehicle.

During an investigatory traffic stop, an officer's actions must reasonably relate to the circumstances prompting the stop. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002). Additionally, the detention must not last longer than needed to effectuate the reason underlying the stop. Id. Further, "the officer should employ the least intrusive means reasonably available to investigate his or her suspicions in a short period of time." Id. "[T]he proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998) (citing United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985)). However, further detention will be justified if, during a valid stop, law enforcement officers develop a reasonable suspicion that the individual was engaged in other criminal activity. See United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998).

In the instant case, after effectuating the lawful stop Trooper Hoppe asked the appellant to step out of the vehicle, and he patted the appellant down for weapons. The appellant contests both actions. Trooper Hoppe testified that the appellant's vehicle was parked too close to traffic for the trooper to stand beside the driver's side of the vehicle. The video of the stop supports the trooper's

testimony. The United States Supreme Court has observed:

> The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may . . . be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 333 (1977). Our supreme court has stated that an officer ordering occupants out of a vehicle during a traffic stop is at most a "mere inconvenience." Berrios, 235 S.W.3d at 107. "'What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.'" Id. (quoting Mimms, 434 U.S. at 109-11, 98 S. Ct. at 333). We conclude that, based upon the foregoing, Trooper Hoppe was justified in asking the appellant to step out of the vehicle.

Further, after removing an individual from a vehicle, "an officer may conduct a pat-down for weapons if he has reasonable suspicion that the driver may be armed." Berrios, 235 S.W.3d at 108. Trooper Hoppe stated that when the appellant stepped out of the vehicle, he saw a "bulge" in the appellant's pocket. In order to determine that the appellant did not have a weapon, Trooper Hoppe patted down the appellant. He testified that the "bulge" was " a large thing of keys and maybe a lighter." In other words, the trooper patted the appellant down "for officer safety." See Mimms, 434 U.S. at 112, 98 S. Ct. at 334. Given the foregoing facts, we conclude that Trooper Hoppe's pat-down of the appellant was reasonable.

## B. Consent

### 1. Whether Consent Given

As his second issue, the appellant questions

> [w]hether the [appellant] consented to a search of the vehicle, and whether such consent was knowing, intelligent and voluntary under article I, section 7 of the Tennessee Constitution and the United States Constitution, Fourth Amendment.

Additionally, the appellant challenges

> [w]hether the consent, assuming consent existed, was itself fruit of the poisonous tree because it was made during and directly resulted from the illegal detention.

As previously noted, a warrantless search of a vehicle is presumed unreasonable unless the

State demonstrates that the search was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. Binette, 33 S.W.3d at 218. One exception to the warrant requirement is a search conducted pursuant to an individual's consent. Troxell, 78 S.W.3d at 871 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248, 93 S. Ct. 2041, 2059 (1973)). However, "[i]n order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)). The State bears the burden of showing by a preponderance of the evidence that the consent to a warrantless search was freely and voluntarily given. Id. at 28-29. The question of whether an accused voluntarily consented to a search is a question of fact to be determined by the totality of the circumstances. Id. at 29.

After asking brief questions about the appellant's destination and the ownership of the vehicle, Trooper Hoppe requested the appellant's driver's license and, as a matter of course for a traffic stop, called dispatch to check his license and registration. Trooper Hoppe testified that the local computers were "down," and he called "Block High Watch Center" in Louisiana to run the appellant's license. While awaiting the information, the trooper asked the appellant for consent to search the vehicle.

Trooper Hoppe testified that he requested consent to search while the appellant's driver's license information was being investigated. The trooper advised the appellant that he wanted to search the vehicle for drugs. Trooper Hoppe stated that the appellant freely gave consent to search. The trial court determined that the appellant gave unequivocal consent to search his vehicle and that the consent was "uncontaminated by duress or coercion." The trial court was concerned that the appellant was not advised of his right to refuse consent to search; however, our courts have not required an officer to inform a person of his or her right to refuse before consent will be deemed valid. State v. Cox, 171 S.W.3d 174, 183-84 (Tenn. 2005).

On appeal, the appellant contends that it is difficult to decipher from the video what the appellant's response was to Trooper Hoppe's inquiry of "you mind me taking a quick look?" The appellant asserts that at the suppression hearing, the trial court found that the appellant replied, "Yes." The appellant argues that, in light of Trooper Hoppe's question, "the response of 'yes' would be a refusal to consent to a search of anything – 'Yes, I mind if you take a quick look.'"

At the conclusion of the suppression hearing, the trial court said, "What I heard on the tape was the officer approaching him, asking him several questions, and saying 'is it okay if I look around,' and [the appellant saying] 'okay.' That's what I heard." Later, during argument, the following colloquy occured between the State and the trial court:

> [The State:] . . . [The trooper] says this is what I'm looking for, you don't have any of those [drugs] in your car. He's educating the [appellant] to what he's looking for, and then he says, "Do you mind if I take a look around in there?" Now, what I hear when I listen to the tape is I hear the [appellant] saying, "Yes, sir, go ahead and look." If you look at the transcript of what the officer testifies to,

your Honor, is basically, "Yes, go ahead, go look." All right, that's what I hear on the tape, that's what the officer testifies to.

> [The court:] Maybe I'm deaf, but I heard "yes."
>
> [The State:] Yes.
>
> [The court:] That's all I heard, "yes."

The trial court's comment, "Maybe I'm deaf, but I heard 'yes,'" must be considered in the context of his comments and ruling as a whole. In our view, the trial court was expressing its opinion that the appellant had consented to the search. Although the appellant asserts that his affirmative response to the question "you mind if I take a quick look" meant "yes, I do mind," the trial court obviously interpreted the appellant's answer, inflection, and behavior as consent to search. Our review of the record, including the video of the stop, leads us to the same conclusion. The appellant contends that he denied consent, but his "will was overborne" by Trooper Hoppe proceeding to search. In our view, the appellant clearly consented to the search. Like the trial court, we believe that the appellant responded "okay" to Trooper Hoppe's request to search. Although the exact language used by the appellant is difficult to discern, it is clear from the inflection of his voice that he gave assent. Moreover, from the trooper's continued questioning regarding whether the trooper would find drugs during the search, the appellant was aware that the trooper wanted to search the vehicle for drugs and he agreed to the search. See Cox, 171 S.W.3d at 186. There is nothing to indicate that the appellant's will was "overborne" by Trooper Hoppe. We can find no evidence to preponderate against the trial court's finding that the appellant gave consent to search his vehicle and that the consent was uncontaminated by coercion, especially in light of the fact that the consent was given after a lawful stop. State v. Kelly, 948 S.W.2d 757, 763 (Tenn. Crim. App. 1996).

2. Scope of Consent

The appellant's final concern is "[w]hether the scope of the [appellant's] alleged consent extended to the inside of the vehicle and of containers located therein." In other words, the appellant argues that "the scope of the consent would have been limited to merely taking a 'quick look,' and would not have encompassed consent to open any sealed or locked containers found within the vehicle."

This court has previously explained:

> The scope of a party's consent is measured by a standard of "'objective'" reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect." The understanding of a "typical reasonable person" will generally depend, in turn, upon the object of the search. Thus, . . . when an officer informs a motorist that he is searching for narcotics, it is objectively reasonable for the officer to conclude that a general

> consent to search the motorist's vehicle includes consent to search containers within the vehicle that might contain drugs.

State v. McCrary, 45 S.W.3d 36, 44 (Tenn. Crim. App. 2000) (quoting Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04 (1991)). When Trooper Hoppe asked for a "quick look" in the vehicle, it was equivalent to a request for a search of the vehicle. See United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002); United States v. Crain, 33 F.3d 480, 484 (5th Cir. 1994); United States v. Boucher, 909 F.2d 1170,1174-75 (8th Cir. 1990); Jacobs v. State, 733 So.2d 552, 555 (Fla. Dist. Ct. App. 1999). However, in McCrary, we cautioned that it is unlikely that a motorist consenting to a search of a vehicle likewise consents to breaking open a locked briefcase or other sealed container within the vehicle. McCrary, 45 S.W.3d 36 at 44.

The appellant's consent to search allowed Trooper Hoppe to legitimately enter the vehicle and begin a search. Consent to search a vehicle necessarily encompasses consent to at least touch items, including locked or sealed packages, contained within the vehicle. As part of the search, Trooper Hoppe picked up the taped, sealed package containing cocaine. While we agree that the appellant's consent likely did not authorize Trooper Hoppe to tear open the heavily-taped package, we do not believe that merely picking up and feeling the outside of the package exceeded the scope of the appellant's consent. See McCrary, 45 S.W.3d at 44 n.3; see also Jimeno, 500 U.S. at 251, 111 S. Ct. at 1804. Regardless, Trooper Hoppe testified that he was trained in drug interdiction. During the consensual search, Trooper Hoppe discovered the package in the front passenger floorboard of the vehicle. Trooper Hoppe testified that, simply by feeling the package, the contents of the package were inherently recognizable as a "brick" of cocaine. The trial court implicitly accredited the trooper's testimony. Thus, the totality of the circumstances gave Trooper Hoppe probable cause to believe the object inside the package was contraband, thereby giving the trooper probable cause to open the package and discover the cocaine within. See State v. Cothran, 115 S.W.3d 513, 524 (Tenn. Crim. App. 2003). Accordingly, the trial court correctly denied the appellant's motion to suppress.

## III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

___________________________________

NORMA McGEE OGLE, JUDGE