# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 22, 2009 at Knoxville

## STATE OF TENNESSEE v. TYWAN GARCIA ARMSTRONG

**Appeal from the Circuit Court for Marshall County**
**No. 08CR21     Robert Crigler, Judge**

———————————

**No. M2008-02837-CCA-R3-CD - Filed March 18, 2010**

———————————

The Defendant, Tywan Garcia Armstrong, was convicted by a jury in Marshall County of (Count 1) sale of a Schedule II Controlled Substance, a Class B Felony; (Count 2) delivery of a Scheduled II Controlled Substance, a Class B felony; (Count 3) possession with the intent to sell a Schedule II Controlled Substance, a Class B felony; (Count 4) possession with the intent to deliver a Schedule II Controlled Substance, a Class B felony; and (Count 5) possession of a deadly weapon with intent to employ it in the commission of an offense, a Class E felony. In this appeal as of right, the Defendant argues that: (1) the trial court erred in denying his motion to suppress evidence obtained from the search of his car; (2) the evidence was insufficient to support his convictions for Counts 1, 2, and 5; and (3) the trial court erred in refusing to apply the mitigating factors submitted by the Defendant at the sentencing hearing. After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

S. Craig Moore, Fayetteville, Tennessee, attorney for appellant, Tywan Garcia Armstrong.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

## OPINION

### *The Undercover Operation*

This case arose from an undercover drug operation where a confidential informant, Wanda Griffin, agreed to call and ask the Defendant to meet her so that she could purchase some cocaine.[1] Prior to her cooperation with the Drug Task Force (DTF), Ms. Griffin was a narcotics user. After a brief stay in the intensive care unit for her drug addictions, she volunteered to work with the DTF in April 2006. On April 26, 2007, Ms. Griffin was working with three members of the Seventeenth Judicial District DTF: Assistant Director Tim Miller, Special Agent Shane George, and Special Agent Billy Osterman. All three agents testified at trial.

Ms. Griffin met with the agents at approximately 3:30 in the afternoon on April 26, 2007 in Lewisburg, Tennessee. Agent Osterman searched Ms. Griffin and her vehicle and gave her a "body wire," which transmitted a signal to a receiver in Agent Osterman's vehicle. The signal from Ms. Griffin's transmitter was amplified through a piece of equipment in the trunk of Ms. Griffin's car. Agent Osterman was able to listen and record everything transmitted through the signal to the receiver. The agents also equipped Ms. Griffin with a backup recording device, which was strictly a digital recorder with a microphone that could not be turned off by Ms. Griffin.

Agent Osterman gave Ms. Griffin one hundred and fifty dollars in the form of a one hundred dollar bill, a twenty dollar bill, and three ten dollar bills. Before he presented her with the money, Agent Osterman recorded the serial number from each bill into his notes. Once Ms. Griffin was issued the money for the undercover operation, the backup recorder was turned on and was not turned off until she returned with the drugs. At that time, Ms. Griffin called a cellular telephone number and talked with a person whom she believed was the Defendant. According to the digital recording, when the Defendant answered, she asked to meet the Defendant at "Berlin" so that she could purchase a "bill fifty."[2] The Berlin Store is located on Franklin Pike past the airport.

After Ms. Griffin made the telephone call to the Defendant, Agent Osterman ensured that all of the recording equipment was working properly before she left to meet the Defendant. When Ms. Griffin arrived at the predetermined meeting location, she called the Defendant and told him that she was waiting for him. A few minutes later, the Defendant

---

[1]Ms. Griffin was paid forty dollars for her cooperation.

[2]Ms. Griffin testified that a "bill fifty" means a hundred and fifty dollars worth of crack cocaine.

drove by Ms. Griffin's car and "tooted the horn." Ms. Griffin followed the Defendant, who was driving a black Ford Taurus, to Holly Lane Road. Once on Holly Lane Road, the Defendant threw a crumpled newspaper out of the driver's side window. Ms. Griffin got out of her car, threw one hundred and fifty dollars into the Defendant's lap, and picked up the newspaper. As Ms. Griffin was returning to her car, the Defendant said, "It's about 30 short . . . I'll catch you later."[3] Ms. Griffin responded by saying, "give me a call." Ms. Griffin drove back to the meeting place with Agent George following her in a separate vehicle.

According to Ms. Griffin, this transaction took place during the daylight hours, and she was within six feet of the Defendant when she gave him the money and retrieved the newspaper. Ms. Griffin testified that she knew the Defendant as "Monkey" prior to her agreement with the DTF. She stated that she recognized him and his voice because she talked with him "hundreds of times" and that she had met the Defendant at this location prior to this transaction. Each time in the past, Ms. Griffin would drive to the Berlin store, and the Defendant would drive by and "toot" his horn. She would then follow him to another location.

Agent Osterman testified that he followed Ms. Griffin all the way to the Berlin store and observed her pulling into the gravel parking lot where she called the Defendant the second time. Agent Osterman went past the parking lot and "set up a surveillance system where he could see through to the gravel parking lot" while Agent Miller continued north and set up surveillance and Agent George went south. Agent Miller informed the others when he saw the black Ford Taurus pass his location and head towards the informant. Once Ms. Griffin began to follow the Defendant, Agent Osterman followed both of the vehicles until they pulled onto Holly Lane Road.

After the drug transaction, Agent Osterman followed the Defendant for several miles. He testified that he saw the Defendant's profile when the Defendant turned left onto Jerre Lane; however, he was unable to see the passenger and could not tell whether the passenger was black or white. Agent Osterman stated that the Defendant's black Ford Taurus had a drive-out tag in the upper left corner of the rear glass window and that the car was damaged on the rear driver side door. When Agent Miller began following Agent Osterman and the Defendant, Agent Osterman went back to the meeting place so that he could collect the evidence, "debrief" Ms. Griffin, and search her car and person. When he arrived, Agent Osterman found the newspaper, opened it, and saw what he recognized to be crack cocaine.[4]

---

[3]The Defendant only gave her one hundred and twenty dollars worth of crack cocaine.

[4]The substance was later confirmed as .5 grams of cocaine base or crack cocaine.

Agent Osterman searched Ms. Griffin and her vehicle, but he did not find any drugs or money in her car or on her person.

*The Traffic Stop*

Agent Miller continued following the Defendant until the Defendant stopped on Jerre Lane. Once on Jerre Lane, he saw the Defendant and the passenger get out of the car and go inside a house. Twenty minutes later, the Defendant and the passenger came out of the house and got back into the car. As Agent Miller was driving towards Jerre Lane, he observed the Defendant roll through a stop sign and turn right towards Highway 417.[5] He followed the vehicle onto Old Columbia Highway, where the Defendant then "took off at a high rate of speed."

Agent Miller caught up with the Defendant and turned on his blue lights. The Defendant pulled over onto the side of the road. Agent Miller got out of his car, approached the Defendant's car, and asked for his driver's license. Agent Miller testified that he smelled marijuana when he approached the vehicle and that the Defendant and the passenger appeared nervous. He asked the Defendant to get out of the car and searched the Defendant for weapons. He asked if he could search the vehicle, but the Defendant did not consent to the search. When asked whether there had been any marijuana in the car, the Defendant stated that there had been marijuana in the car recently.

When Agent Miller explained that he had probable cause to search the vehicle, the Defendant responded by saying that there was a gun in the car under the driver's seat. At this point, the passenger was instructed to get out of the car. Once the passenger was out of the car, Agent Miller and Agent George searched the vehicle and found: marijuana residue in the carpeting; a loaded, semiautomatic pistol under the driver's seat; pieces of newspaper between the seats and the floorboard; several packages of what appeared to be crack cocaine[6] wrapped in newspaper under the headliner of the vehicle; and a loaded, 12-gauge pump shotgun in the trunk. Agent Miller also found one hundred and seventy dollars on the Defendant's person. When Agent Miller checked the serial numbers on the money, he found that one hundred and fifty dollars matched the serial numbers on the money given to Ms. Griffin. He also took down the Defendant's cell phone number, which he confirmed was the same cellular telephone number that the informant called to set up the undercover operation.

---

[5]At some point, Agent George began following the Defendant and Agent Miller.

[6]The substance was later confirmed as 3.0 grams of cocaine base or crack cocaine.

The State established the chain of custody for all of the evidence obtained in this case through the testimony of Agent Osterman, Agent Miller, Director Tim Lane of the Seventeenth Judicial District DTF, and Special Agent John Scott of the Tennessee Bureau of Investigation, Nashville Crime Laboratory. We will not recount the substance of their testimony regarding the chain of custody because it was properly established in this case and the Defendant does not assert otherwise.

The Defendant called two witness in his defense. Bessie Claude, the Defendant's mother, testified that she has never called her son "Monkey" or heard anyone call her son "Monkey." On cross-examination, she admitted that she does not live in Lewisburg, Tennessee; therefore she could not be certain that other people did not call her son "Monkey." Shavonda Polk, the Defendant's girlfriend, testified that the Defendant's nickname is "Ace," not "Monkey," and that the Defendant has "Ace" tattooed on the back of his neck. She also stated that the Defendant does not own or drive a black Ford Taurus. However, on cross-examination she admitted that her relationship with the Defendant was inconsistent and that she could not be certain that he did not own or drive a black Ford Taurus.

## ANALYSIS

### Motion to Suppress

The Defendant argues that the trial court erred in denying his motion to suppress the evidence found in his vehicle and his statement to Agent Miller because the traffic stop and resulting search were unlawful. The State contends that Agent Miller had probable cause to stop the Defendant's car because he was speeding and that once he smelled the marijuana, he had probable cause to search the car.

Agent Miller was the only witness who testified at the suppression hearing. He recounted the substance of the drug deal as discussed above, and he discussed the traffic stop in further detail. He stated that he stopped the Defendant for rolling through the stop sign and speeding because he did not want the Defendant to know that Ms. Griffin was a confidential informant. He recounted that once he approached the vehicle, he noticed a "strong odor of marijuana emitting from the vehicle." Agent Miller testified that he told the Defendant that he had probable cause to search the car based upon his detection of a marijuana smell and that the Defendant admitted that marijuana had been in the car recently. Agent Miller testified that the Defendant stated that he understood and disclosed that there was a weapon under the driver's seat. In searching for the weapon, Agent Miller noticed marijuana residue in the carpeting, but he could not see the weapon from the front because it "[l]ooked like the construction of the seat had been manipulated into a holster . . . where

the weapon would slide in under the seat." In order to retrieve the gun, Agent Miller had to search from the backseat of the car under the driver's seat. After he secured the weapon, he continued to search the car and even "[s]tuck [his] hands up in the headliner of the vehicle." In the headliner, he found "four to eight bags containing crack cocaine individually packaged."

Agent Miller testified that after he found the evidence in the car, he advised the Defendant of his Miranda rights, and the Defendant waived his rights. Agent Miller stated that the Defendant admitted that he smoked crack cocaine on occasion and that he had been involved in "illegal distribution of crack cocaine for at least a year or more." The Defendant admitted ownership of the pistol, the crack cocaine, and the shotgun found in the trunk. The Defendant also told him that he was purchasing all of his crack cocaine from Colby Reynolds and that he would like to work as a confidential informant. After the Defendant agreed to cooperate, Agent Miller let the Defendant go and exchanged telephone numbers with him, but the Defendant never called him.

At the conclusion of the hearing, the trial court found that Agent Miller had probable cause to stop the Defendant because the Defendant ran a stop sign and that Agent Miller had probable cause to search the car when he noticed the odor of marijuana. The trial court further stated that Agent Miller was "entitled to arrest the [D]efendant after [he] observed the marijuana," and that once the Defendant "alerted them to a loaded weapon under the seat which had been recovered" he had the right to seize the car and do an inventory search of the vehicle. Therefore, the trial court concluded that, pursuant to the inevitable discovery doctrine, the shotgun found in the trunk and the "four to eight bags [of crack cocaine] found in the headliner would have ultimately been found." The trial court also noted the Defendant's statement to Agent Miller, but the trial court stated that the "voluntariness of that statement [was] not attacked or not at issue in this case."

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted

under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any "warrantless search or seizure is presumed [to be] unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). "Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search." State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007) (citing State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005)). Additionally, a police officer may make "an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); Terry v. Ohio, 392 U.S. 1, 20-21 (1968).

In this case, the trial court found that Agent Miller observed the Defendant running through a stop sign, which is a Class C misdemeanor. See Tenn. Code Ann. § 55-8-149. Our supreme court has stated that

> [T]he protection afforded by [a]rticle I, section 7 of the Tennessee Constitution is co-extensive with the protection afforded by the Fourth Amendment to the United States Constitution. Accordingly, a stop based upon probable cause is valid under the Tennessee Constitution, without regard to the actual subjective motivations of police officers.

State v. Vineyard, 958 S.W.2d 730, 731 (Tenn. 1997). In so holding, the Tennessee supreme court adopted the "Supreme Court's interpretation of the Fourth Amendment in [Whren v. United States, 517 U.S. 806 (1996)]." Vineyard, 958 S.W.2d at 736. Regardless of Agent Miller's motivation for stopping the Defendant, he had probable cause to stop the Defendant when he observed him running through the stop sign. See State v. Whitney Ann Graves, No. M2007-02415-CCA-R3-CD, 2008 WL 5263431, at *3 (Tenn. Crim. App. Dec. 17, 2008), perm. app. denied (Tenn. May 4, 2009).

When Agent Miller smelled marijuana in the Defendant's vehicle, he had probable cause to search the vehicle pursuant to the exigent circumstances relating to the inherent mobility of automobiles. Hicks v. State, 534 S.W.2d 872, 873-74 (Tenn. Crim. App. 1975) (holding that the smell of marijuana emanating from the defendant's car provided the officer

-7-

with probable cause to search the vehicle given the inherent mobility of automobiles); see also State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009) ("[T]he automobile exception does not require a separate finding of exigency in addition to a finding of probable cause under the United States Constitution." (quoting Maryland v. Dyson, 527 U.S. 465, 466-67 (1999))). "The rationale for the automobile exception [to the warrant requirement] is two-fold. First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Second, individuals have a reduced expectation of privacy in their automobiles." Saine, 297 S.W.3d at 207 (citations omitted).

The scope of Agent Miller's search was "defined by the object of the search and the places in which there is probable cause to believe that it may be found." United States v. Ross, 456 U.S. 798, 824 (1982); see also State v. McCrary, 45 S.W.3d 36 (Tenn. Crim. App. 2000). Here, Agent Miller was searching for marijuana, guns, and any evidence of the undercover drug buy. Consequently, Agent Miller's probable cause to search extended to all parts of the vehicle, including the headliner and the trunk. Ross, 456 U.S. at 824; see also State v. Ricky Allen Frazier, No. E2003-02853-CCA-R3-CD, 2004 WL 1541306, at *5 (Tenn. Crim. App. July 9, 2004) ("If probable cause justifies a search of a vehicle, it justifies a search of every part of the vehicle, including the trunk." (citing Ross, 456 U.S. at 823-24)). Following our review, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to suppress.

Sufficiency

The Defendant argues that the evidence was insufficient to convict him of Counts 1 and 2, sale and delivery of a Schedule II Controlled Substance. The Defendant states that the proof was not sufficient to show that the Defendant was driving the car at the time of the drug deal, and the one person who identified the Defendant was an unreliable confidential informant. The Defendant also argues that the evidence was insufficient to convict him of Count 5, possession of a deadly weapon with intent to employ it in the commission of an offense. He contends that Ms. Griffin did not state that she saw a gun or was threatened in any way. Moreover, the Defendant never got out of the car, and the weapons were not in a location where they could have been retrieved quickly. The State argues that the evidence was sufficient to convict the Defendant.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor

of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

*Counts 1 and 2*

The convictions of selling and delivering .5 grams or more of a cocaine base requires proof that the Defendant knowingly sold and delivered a controlled substance. Tenn. Code Ann. § 39-17-417(a)(2)(3). The evidence in this case relating to Counts 1 and 2 was overwhelming. Ms. Griffin and all three of the agents identified the Defendant at trial as the person who provided the drugs in the undercover drug operation. We do note that Ms. Griffin was a narcotics user and was paid for her cooperation. However, she was followed by the agents at all times, and her conversations with the Defendant were recorded throughout the entire undercover operation. More importantly, the jury chose to accredit her testimony. Ms Griffin and the agents confirmed that she called the Defendant's cellular telephone number to set up the drug deal, and Agent Miller testified that the cellular telephone number that the Defendant gave him was the same number that Ms. Griffin used to call the Defendant. Agents recovered one hundred and seventy dollars from the Defendant, one hundred and fifty of which corresponded to the money given to Ms. Griffin. Although there was some discussion regarding the fact that the Agents thought the Defendant's name was Talvin Armstrong, the agents were clear that they knew the Defendant as "Monkey" and that they were certain that "Monkey" was Tywan Armstrong. Following our review, although we do note that these convictions were merged at sentencing, we conclude that the evidence was sufficient to support his convictions in Counts 1 and 2.

*Count 5*

The conviction of Count 5 in the indictment requires proof that the Defendant possessed a deadly weapon with the intent to "employ it in the commission of or escape from an offense." Tenn. Code Ann. § 39-17-1307(c)(1) (2006). In order to convict the Defendant of this offense, the State had to prove that the Defendant had the appropriate intent and that he either possessed the weapon or that he knowingly had the "power and the intention at a

given time to exercise dominion and control over [the weapon], either directly or through others." State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (citations omitted).

Whether the Defendant had the appropriate intent and actually possessed or constructively possessed any weapons during the commission of the felony was for the jury to determine. State v. Steven D. Pittman, No. M199900320-CCA-R3-CD, 2000 WL 374755, at *3 (Tenn. Crim. App. April 7, 2000), perm. app. denied (Tenn. July 31, 2000) (citations omitted). The weapons involved were loaded, and they were found under the driver's seat and in the trunk of the car. According to the testimony presented at the suppression hearing and at trial, the gun under the driver's seat was in a makeshift holster that was wedged into the construction of the seat. The Defendant knew where the gun was located because he told Agent Miller how to retrieve the gun. The Defendant and his car were watched from the time he arrived at the drug buy until he was arrested. The agents did not observe the Defendant removing weapons or bringing weapons to the vehicle after the undercover operation; thus, it is reasonable to believe that whatever was inside the car at the time of his arrest was in the car at the time of the commission of the felony. The loaded weapon was within the Defendant's reach, and he knew how to retrieve the weapon; these facts together "permit[] a reasonable inference that, if necessary, [the] Defendant was prepared to use the gun" in the commission of the felony. See State v. David Wayne Bernard, No. E2005-00852-CCA-R3-CD, 2006 WL 1063687, at *6 (Tenn. Crim. App. Apr. 21, 2006) (upholding conviction for similar offense when gun was found in trunk of vehicle). Accordingly, we conclude that the evidence was sufficient to support his conviction in Count 5.

Sentencing

The Defendant argues that his sentence should be reduced because the trial court did not apply the mitigating factors suggested by the Defendant. The State argues that the trial court acted within its discretion in refusing to apply the submitted mitigating factors.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

The Defendant committed this offense on April 26, 2007; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in 2005. The act provides that:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> > (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> >
> > (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and whether their application was not otherwise barred by statute. Id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

After reviewing the record, we conclude that the trial court considered the appropriate sentencing principles and all relevant facts and circumstances in the Defendant's case. Thus, we will review the trial court's sentencing decision in this case under a de novo standard of review with a presumption that the trial court's sentencing decisions were correct.

The State submitted the following two enhancement factors: (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (10) the defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (10). The trial court applied enhancement factor 1 but declined to apply enhancement factor 10. In applying enhancement factor 1, the trial court noted all of the Defendant's previous criminal convictions and criminal conduct. The Defendant does not challenge the imposition of the enhancement factor; therefore, we will not discuss the court's decisions on this issue other than to say that the record supports the trial court's application of the enhancement factor.

The Defendant requested that the trial court consider the Defendant as an especially mitigated offender and also submitted the following three mitigating factors:

(1) The defendant's criminal conduct neither caused nor threatened serious bodily injury;

(7) The defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self;

(13) Any other factor consistent with the purpose of [the Tennessee Criminal Sentencing Reform Act of 1989, including but not limited to the fact that Defendant has sought drug rehabilitation]

Tenn. Code Ann. § 40-35-113(1), (7), (13).

The trial court considered but declined to apply the three mitigating factors submitted by the Defendant. In regards to mitigating factor 1, the trial court stated that "the law does not recognize that the [D]efendant's conduct neither caused nor threatened serious bodily injury." The court compared this mitigating factor with enhancement factor 10 submitted by the state and stated that the legislature has already taken the dangerousness of cocaine into account when setting the range of sentencing for this particular offense. In declining to apply mitigating factor 7, the court stated:

> I don't find [that] the proof brings that out. Clearly, every time somebody commits a crime, you can argue that in every case where there's some element or profit involved, and I don't believe that mitigating factor is broad enough to cover that. You have to prove something more, that the [D]efendant was motivated by [a] desire to provide necessities for the [D]efendant's family or the [D]efendant's self. I don't believe that the proof rises to that level.

In declining to apply the final mitigating factor, the trial court noted that the Defendant's attempts at rehabilitation conflicted with a scheduled court date in this case. Also, the trial court stated that "seven days[7] [of drug rehabilitation] given that kind of eight ball every other day drug usage is not sufficient to make that mitigating factor or to be - - no disrespect, would not be sufficient [rehabilitation] for that kind of drug problem."

---

[7]The record indicates that the Defendant completed a fourteen day treatment program at the Plateau Mental Health, New Leaf Recovery Center.

In sentencing the Defendant, the trial court merged Count 2 and Count 4 with Count 1 and Count 3, respectively. After denying alternative sentencing and declining to afford any weight to the submitted mitigating factors, the trial court imposed sentences in the middle of the range for all of the Defendant's convictions, ordering all sentences to be served concurrently. In regards to Counts 1 and 3, both Class B felonies, the trial court imposed sentences of 10 years out of a possible sentence of 8 to 12 years. In regards to Count 5, a Class E felony, the trial court imposed a sentence of 1 year and 6 months out of a possible sentence of 1 to 2 years.

The record reflects that the trial court followed the applicable sentencing principles and appropriately found the existence of applicable enhancement factors. The record shows that the trial court gave proper consideration, but no weight, to any proposed mitigating factors. Under the revised sentencing act, this court may not review the weight afforded the enhancing and mitigating factors provided the trial court followed the principles of sentencing. Given that the enhancement factor was supported by the record and that the trial court considered the mitigating factors as required, we conclude that the trial court followed the appropriate sentencing principles in this case. Accordingly, we affirm the Defendant's sentences.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE